In the Matter of the Estate of Christopher J. Hill. Harris Trust and Savings Bank, Executor of the Estate of Christopher J. Hill, Deceased, Appellee, v. Virginia R. Hill, Appellant.

**Gen. No. 48,890.**

First District, Second Division.

May 29, 1963.

Rothschild, Hart, Stevens & Barry, of Chicago (L. Edward Hart and William G. Myers, of counsel), for appellant.

McDermott, Will & Emery, of Chicago (Hamilton Smith, of counsel), for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court:

Harris Trust and Savings Bank, executor of the estate of Christopher J. Hill, deceased, brought a citation proceeding against decedent's widow, claiming ownership of 2000 shares of the common stock of Lakefront Realty Corporation. The certificate for those shares was issued in the name of decedent and so remained on the books of the corporation at the time of his death; it was never endorsed but was in the possession of the widow at the time of decedent's death.

This matter comes up for the second time on appeal. On the first trial the executor contended, and the court agreed, that the widow was incompetent to testify. We reversed the order of the trial court in favor of the executor and remanded the cause for a new

397

trial (30 Ill App2d 243, 174 NE2d 233 (1961)). At the second trial the executor rested its case on a stipulation pertaining to record ownership and possession, but then was given leave to reopen its case for the purpose of examining Mrs. Hill as the court's witness. After hearing her testimony, the court found for the executor. Subsequently, pursuant to the motion of respondent, proofs were reopened for the purpose of introducing the newly discovered testimony of a corroborating witness. After considering the entire matter, the court again found for the executor, and this second appeal follows.

The salient facts disclose that all the shareholders of the Lakefront Realty Corporation are members of the Lake Shore Club of Chicago. The real estate owned by the realty corporation is occupied by the club and its members. Until recently a person could not live at the club without becoming a member and shareholder of the corporation. It further appears that Mr. Hill was very active at the club, and he and Mrs. Hill lived there for six years. After Mr. Hill became ill and required home cooking, and Mrs. Hill's mother, an invalid, required nursing care, the Hills moved from the club; but during this period it was understood between the Hills that Mrs. Hill would return to the club to live if she survived her husband and her mother, and Mr. Hill often stated to his wife that he wanted her to have the stock for her protection so that she could live at the club.

Through the years Mr. Hill acquired stock in the realty corporation as it became available upon the death or resignation of a member. He often asked Mrs. Hill to advise him when she learned of any stock's becoming available, and through her co-operation he acquired stock from people she knew of who were leaving.

On July 14, 1958, some two weeks before his death, Mr. Hill asked his wife to accompany him to the safe-

ty deposit box at the Lake Shore Bank. She had never been there before. The only time she subsequently visited the box was on September 2, 1958, following her husband's death on August 31, 1958, when she removed some of her personal effects and some other items which Mr. Hill had asked her to take. While at the bank on July 14, 1958, after explaining some matters to her, Mr. Hill gave his wife the Lakefront Realty Corporation stock which is involved in this proceeding. The certificate at that time was in his name; it was never endorsed. When he gave her the certificate, Mrs. Hill testified, he stated, "Here, Virginia, take this, it belongs to you, and keep it." Later that day he told her the reason he gave her the stock was because eventually she would be alone, and he wanted her then to move back to the club where she would be protected. She took the stock certificate from the safety deposit box that day and has had possession of it ever since.

The newly discovered evidence consisted of the testimony of Marshall Keig who has been president of the realty corporation since 1946. His signature appeared on the stock certificate. Mr. Keig had known Mr. Hill for thirty or thirty-five years. They were both interested in the club and often discussed matters concerning the stock. Mr. Hill was interested in it as an investment, and he often mentioned that he wanted his wife to have his stock so that she could live at the club after his death and perpetuate his interest in the club. Through the years he often told Mr. Keig that he was going to give the stock to Mrs. Hill, and shortly before his death, in his last conversation with Mr. Keig, he told him that he had given the stock to Mrs. Hill.

Mr. Keig testified that it was customary for a club member to give stock to his wife in the manner Mr. Hill adopted, even though the stock would not be officially transferred on the books of the corporation

until after the death of the member. Mrs. Hill could not become a member of the corporation in her own right until after Mr. Hill's death. Mr. Keig, as president of the corporation, was advised of the circumstances concerning the prospective transfer and was asked to look after Mr. Hill's wife in this connection.

The executor concedes that it has the burden of proving by a preponderance of the evidence that the stock belonged to the deceased at the time of his death. We so stated in our first opinion (p 247), and it has not been disputed throughout these proceedings. Authority for this rule is found in a case which is strikingly similar to this proceeding, In re Hurd's Estate, 294 NYS 273 (Surr Ct 1937). There the court held (pp 275–276) that the circumstance that stock certificates in another party's possession were not endorsed by the registered owner was insufficient to establish the registered owner's title, since title to unendorsed certificates may pass by manual delivery and especially since the other party remained in actual possession. Actual delivery of an unendorsed instrument, said the court (p 276), carries with it an implied and irrevocable power of attorney to do the things necessary in completing the transfer, so that difficulties in effecting transfer do not affect the title. The court concluded (p 276):

> "The maximum that can be said for the case of petitioner is that some shadow of a doubt might remain whether the shares are respondent's or belonged to deceased. That is not enough, since petitioner was bound on the whole case to show title in the estate by at least a preponderance of the evidence. . . ."

The same test is applied in Illinois; in In re Estate of Jones, 274 Ill App 616 (1934), a citation proceeding was initiated to recover stock certificates in the possession of decedent's sister, some of which were

unendorsed. On review the court stated (p 624): "We think that the trial judge was correct in his holding that 'the burden of proving by a preponderance of the evidence that the stocks belonged to the deceased at the time of his death was *upon the estate,*'" relying on Mohlke v. People ex rel. Moore, 117 Ill App 595 (1905), and Martin v. Martin, 174 Ill 371, 51 NE 691 (1898). In the Martin case, involving the ownership of an unendorsed note, the language of the court (p 373) is relevant here:

> "The law will not require one in the possession of a chattel or security, negotiable or otherwise, under claim of ownership, to deliver the same over upon the mere adverse claim of another, but will only disturb such possession upon proof of the right of such adverse claimant,—that is to say, the presumption of the law is that one so in possession is prima facie entitled to remain in possession until the contrary is made to appear by proof. Any other rule would require every citizen to yield to the mere assertion of another. It therefore became incumbent upon the petitioning executors, in order to obtain favorable action upon the part of the court, to introduce such proof as would warrant an order that the defendant in error should deliver up possession of said notes. . . ."

In our first opinion we stated the rule with respect to the facts of this case as follows (p 248):

> "In the situation here involved, the introduction of the unendorsed certificate and the showing that it remained in the name of decedent on the books of the corporation, did not, of themselves, constitute sufficient evidence to show ownership in the estate. As against this scant proof is another fact of evidentiary value—possession of the certificate by the widow. . . ."

401

The scant proof to which we there referred has not been augmented by any additional evidence tending to show ownership in the estate. As a matter of fact the executor commenced the second trial by resting its case upon a stipulation that the certificate in question was registered in the name of the decedent and was unendorsed, while possession was in the widow. All additional evidence adduced on the second trial established the fact that the decedent had given the stock to his wife. In view of the admitted fact of possession in the widow, it does not appear that at any time during the course of these proceedings has the executor established a prima facie case. On the other hand, now that the widow has been permitted to testify on the second hearing, her testimony has been corroborated by an independent and disinterested witness, Mr. Keig, president of the corporation which issued the stock. The testimony of both witnesses was consistent with the normal possibilities and probabilities of how a husband and wife would handle a transaction which was so closely interwoven with the social club they had both been interested in for so long, and no evidence was adduced to contradict the testimony of either Mrs. Hill or Mr. Keig.

The executor, conceding that it had the burden of proving ownership of the stock certificate, again argues that it met this burden and established a prima facie case by showing that the stock was registered on its face and on the books of the corporation in the name of decedent and was not endorsed. Its counsel on the first appeal relied on section 21 of the Uniform Stock Transfer Act (Ill Rev Stats 1959, c 32, § 436) in support of their position, but we adhere to the rule enunciated (p 248) in our first opinion that delivery of an unendorsed stock certificate is effective to pass title to a donee, and there cited authority to the effect (pp 247–248) that the object of the Uniform Stock Transfer Act was merely to regulate the

402

mode of transfer upon the books of the corporation and to furnish a rule for deciding between claimants contesting the ownership of stock, and that the provision was inserted to protect the corporation in the payment of dividends or otherwise, but was not intended to control the rights of parties in matters as between themselves. We also cited authorities, including In re Estate of Antkowski, 286 Ill App 184, 193–196, 3 NE 2d 132 (1936), a case of first impression, enunciating the rule in Illinois and elsewhere that delivery of an unendorsed certificate would be effectual to pass an equitable title enforcible by the donee.

■ We have no quarrel with the contention of the executor that respondent had the burden of proving the gift by clear and convincing evidence. Mrs. Hill testified unequivocally that decedent gave her the stock certificate at the bank on July 14, 1958. Mr. Keig fully corroborated her. As heretofore stated, he testified that decedent at the end of his life and in his last conversation told him that he had given the Lakefront Realty Corporation stock to his wife. There is no evidence which contradicts the testimony of either witness; rather, all the evidence is consistent with and supports the conclusion that the gift was made as claimed by respondent, in keeping with the interest of the Hills in the Lake Shore Club, as heretofore related. The manner in which the stock was transferred was not unusual; indeed, Mr. Keig testified that it was a customary procedure in making a transfer of the realty corporation stock from husband to wife, and Mr. Hill undoubtedly knew this and relied on this practice. Mr. Keig was a completely disinterested witness. At no time during the course of this proceeding has anyone seriously contended that Mr. Hill did not want his widow to have the stock here in question, nor has it been suggested that either Mrs. Hill or Mr. Keig gave false testimony in this cause.

403

In In re Estate of McVicker, 39 Ill App2d 389, 188 NE2d 731 (1963), the third division of this court held that evidence of decedent's intention to make a gift to the petitioner of a stock certificate which was in the petitioner's possession was sufficient to establish a gift inter vivos, although the certificate was not endorsed and decedent had received one dividend. The donor's express reservation of dividends from the principal of a gift, said the court (p 395), does not impair its validity. In answer to respondent's contention there that petitioner was competent to testify because section 2 of the Evidence Act (Ill Rev Stats 1961, c 51) does not apply to citation proceedings, the court commented (p 397) that it is true that rules of evidence may be relaxed in a citation proceeding brought by the representative of an estate against someone withholding assets claimed by the estate, under the provisions of sections 183 and 185 of the Probate Act (Ill Rev Stats 1961, c 3), but pointed out that the McVicker case was brought under section 187a of the act and was by a claimant against an estate.

It was contended in the trial court and is again urged that a gift such as this must, in every case, be viewed with suspicion, whether or not the circumstances present any ground therefor; that anything less than an extremely strict approach to the problem would be indefensible. There is no suggestion in this proceeding of any fraudulent practice. Furthermore, from the standpoint of general principles to be followed in all cases, attention and consideration should be given to the position of the donee. It cannot be denied that gifts can be and commonly are made in the manner described here. It is therefore pertinent to inquire how a donee can be expected to offer more in the way of proof than has been presented here.

Petitioner seeks to discredit Mrs. Hill's testimony because she had no independent recollection of the

exact day on which her husband gave her the stock. She knew, however, that the transaction took place at the safety deposit box at the Lake Shore Bank; that there was only one occasion during decedent's lifetime that she visited the box with him; that this visit took place on a very warm day toward the end of decedent's life when he was very weak and not well; and that her husband died on August 31, 1958. With this recollection, coupled with the bank records as to dates of access to the box, Mrs. Hill was able to deduce the fact that she accompanied her husband to the bank vault on July 14, 1958. She never pretended to have an independent recollection of the exact date of the gift.

Mrs. Hill visited the safety deposit box at the Lake Shore Bank on only two occasions, with her husband on July 14, 1958, and by herself on September 2, 1958. When questioned about the second visit, she testified that it took place on August 31, 1958, but qualified this answer by stating that the visit was "around that date." The bank records show that the visit took place on September 2, 1958, the first business day after August 31, 1958. The exact date of the visit has no relevancy in this proceeding. Mrs. Hill freely stated that she went to the vault alone on this occasion.

On the basis principally of these minor inaccuracies, petitioner contends that the widow's testimony was "replete with inaccuracies, inadequacies and inconsistencies." But Mrs. Hill testified unequivocally that decedent gave her the stock in the manner claimed. It seems unlikely to us that, several years later, a person would remember the exact dates of visiting a bank vault; rather, the fact that the witness testified to approximate dates lends credibility to her testimony. It is not inherently improbable, unlikely, or unreasonable; it stands uncontradicted by positive testimony and by circumstances; it was corroborated not only

by the fact of possession but also by the disinterested testimony of Mr. Keig. To us the evidence is clear and convincing.

Although the court made no specific finding to support the order, it seems that he rejected the uncontradicted testimony of both Mrs. Hill and Mr. Keig. The Illinois rule on this subject was stated in Kelly v. Jones, 290 Ill 375, 378, 125 NE 334 (1919), in the following language:

> "There may be such inherent improbability in the testimony of a witness as to justify a court in disregarding his evidence even in the absence of any direct contradiction. If his testimony is contradictory of the laws of nature or universal human experience, so as to be incredible and beyond the limits of human belief, or if facts stated by the witness demonstrate the falsity of the testimony, the court is not bound to believe him. . . . If there is a contradiction of testimony, either direct or by facts and circumstances proved, much weight is to be given to the findings of the chancellor, who saw and heard the witness, since his credibility may be seriously affected by his appearance, manner and conduct while testifying. But [in the Kelly case] there was no question of weighing the testimony of the complainant against contradiction, since there was no contradiction whatever of the facts testified to. Where the testimony of a witness is uncontradicted, either by positive testimony or circumstances, and is not inherently improbable, it cannot be rejected. . . ."

The trial judge in this proceeding first ruled without the benefit of hearing the corroborating testimony of Mr. Keig. The court's comments at the time of the first ruling indicate that lack of corroboration of Mrs. Hill's testimony was a key factor in his decision. After the corroborating testimony was intro-

duced, the judge's comments took on a different tone. It was then that he indicated concern over the question whether it would have been possible to make an inter vivos gift of the stock in question in view of the restrictive bylaw provisions relating to the transfer and disposition thereof. It may well be that although the executor, on trial of the proceeding, did not argue this phase of the litigation and has not urged it on this appeal, these restrictions nevertheless constituted the real basis for the court's decision.

■■ The restrictions to which the judge referred are printed on the back of the certificate (article XII of the bylaws). Perhaps the gravamen of the court's reasoning was that this could not have been a gift to Mrs. Hill because she was not a member of the club, but under the authority of Blair v. Kirchner, 319 Ill App 348, 351, 353, 49 NE2d 292 (1943), we think the proper interpretation of article XII, having to do with the restrictions respecting disposition and transfer of the stock, and the extent to which it could or should be enforced in this situation are matters which are appropriate for discussion between Mrs. Hill and the corporation, but such a consideration has no proper place in the executor's action against Mrs. Hill. Mr. Hill has been dead more than four years. During that time his widow's only difficulties have been with the professional fiduciary appointed to protect her interest; she certainly has no quarrel with the Lake Shore Club or the Lakefront Realty Corporation. The corporation does not challenge the transaction in question. Under the circumstances we can see no reason for this court to give greater effect to the bylaws than does the corporation itself.

A case in point on this question appears in Matter of Klarfeld, NYLJ, January 10, 1963, page 18 (Surrogate's Court of Kings County, New York), as set out in Recent Decisions Prepared for the Trust Department of The First National Bank of Chicago, April

1963, page 7. When Dorothy Klarfeld died on April 25, 1960, eight United States Savings Bonds registered in her name were in the possession of another. The holder of the bonds claimed she had received them as a gift. On the accounting, Dorothy Klarfeld's sole distributee claimed that the bonds were not transferable or assignable, and that the purported gift was therefore ineffectual to transfer title. However, upon examination of treasury regulations, the surrogate concluded that the purpose of the regulations was to establish the right of survivorship; that nowhere therein was there any language which prohibited a sole owner of a bond from making a valid gift inter vivos or otherwise; and that the regulations had the force of law but did not apply to individual rights of persons who, under state law, became equitably entitled to the proceeds of the bonds. He held that the treasury department would recognize a judicial determination as to who was entitled to payment or the reissuance of the bonds upon the owner's death; that a gift inter vivos could therefore be made by the sole owner, and if the donee proved a valid gift, "the court may determine ownership thereof which must be recognized by the Treasury Department."

For the foregoing reasons the order of the Probate Court is reversed and the cause remanded with instructions to enter a finding and an order that Mrs. Hill is the donee and the owner of the stock.

Order reversed and cause remanded with instructions.

BURKE, J, concurs in the result.

BRYANT, PJ, dissenting:
In the first appeal, 30 Ill App2d 243, it was pointed out that the sole objective of the citation proceeding was to determine the ownership of the stock, and this

could be determined only after a full hearing. Accordingly, we directed that Mrs. Hill be allowed to testify.

When the case was retried before Judge Seidel, Mrs. Hill was allowed to testify. Her appearance and demeanor were observed by the court. She was afforded every opportunity to prove that the stock had been given to her. Only after a full and complete hearing did Judge Seidel resolve the issue of whether or not a gift had been established.

The majority here has decided that Mrs. Hill has met the burden of proving the inter vivos gift by clear and convincing evidence and that the lower court's decision was manifestly against the weight of the evidence.

There are minor inaccuracies in Mrs. Hill's testimony which taken alone would not cast great doubt upon her words, but, there is little affirmative convincing evidence that she possessed the stocks at all before her husband's death. She testified uncontradicted that she picked up the stocks on July 14. But, the records of the bank show no record of her presence in the vault upon that date. Nor is the testimony of Mr. Keig of any clear corroborative value. He testified that Mr. Hill had told him two or three times in the last year of his life that "he had placed the stock in her hands." But, she only held it according to her own testimony from July 14th to August 30th of that year and that Mr. Keig would have seen him five or six times when he was sick to discuss it seems improbable. This does not necessarily lead us to the conclusion that there was a physical transfer. Hill could just as well have told his wife to get the stocks after his death. Indeed, for all we know, the only time Mrs. Hill every stepped foot in the Lake Shore Bank was on September 2, the first business day after her husband's death.

The court below was the trier of fact. There were numerous factors to be weighed. To be against the

manifest weight of the evidence requires that an opposite conclusion be clearly evident. Schneiderman v. Interstate Transit Lines, Inc., 331 Ill App 143, 72 NE 2d 705; Olin Industries, Inc. v. Wuellner, 1 Ill App 2d 267, 117 NE2d 565; Griggas v. Clauson, 6 Ill App 2d 412, 128 NE2d 363; Bunton v. Illinois Cent. R. Co., 15 Ill App2d 311, 146 NE2d 205. I am unable to agree that the court's decision was against the manifest weight of the evidence.