*In re* ESTATE OF NELLIE HEILMAN, Deceased.—(MARGUERITE EBELING, Adm'r*of the Estate of Nellie Heilman, Deceased, Petitioner-Appellant, *v.* WILLIAM F. BURSON, Respondent-Appellee.)

Third District    No. 75-96

Opinion filed April 7, 1976.

Clevenger & Metzler, of Pekin (Robert Clevenger, of counsel), for appellant.

Oltman & Morris, of Pekin (William F. Morris, of counsel), for appellee.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Marguerite Ebeling, administrator of the estate of her sister, Nellie Heilman, brought a citation proceeding against William F. Burson to recover the proceeds of three checks totaling $18,000, together with certain securities and certificates of deposit having a value of $34,900 which the deceased had placed in Burson's possession during her lifetime. Pursuant to the provisions of the Probate Act set out in the footnote,[1] the Circuit Court of Tazewell County ruled that Nellie Heilman had made valid *inter vivos* gifts to Burson, who was not related to her, and that the disputed assets were his property. Petitioner appeals from the judgment entered in favor of Burson, contending that the findings and judgment were manifestly against the weight of the evidence.

According to the evidence, when Nellie Heilman was about 80 years of age, in 1968, her third husband died, and she purchased a life estate in a house in Pekin from Arlene Gauger, her late husband's niece, for $2,500. Shortly after moving into the home, Nellie became acquainted with

---

[1] Ill. Rev. Stat. 1973, ch. 3, §183: "Upon the filing of a verified petition therefor, the court shall order a citation to issue for the appearance before it of any person whom the petitioner believes (1) to have concealed, converted, or embezzled or to have in his possession or control any personal property, books of account, papers, or evidences of debt or title to lands which belonged to a person whose estate is being administered in that court or which belongs to his estate or to his executor, administrator, guardian, or conservator ° ° °."

Section 185 provides, in part: "At the hearing the court may examine the respondent on oath whether or not the petitioner has proved the matters alleged in the petition, may hear the evidence offered by any party, may determine all questions of title, claims of adverse title, and the right of property, and may enter such orders and judgment as the case requires."

Burson, age 40, who lived alone a few doors from Nellie. Nellie's sister, Mrs. Ebeling, and her sister's daughter and family lived in East Moline, Illinois. During the last two or three years of her life, Nellie had very little contact with any of her relatives. No question was raised as to her mental capacity, and she continued to manage her own affairs until her death, which was apparently sudden and unexpected. She left no will.

During the last two years, Burson visited Nellie almost every day, sometimes preparing or purchasing hot meals for her, taking care of screens and storm windows, repairing her fence and porch railing, replacing her front steps, helping with her laundry, taking her for rides, buying her groceries and doing numerous other personal favors. He also made out her deposit slips and took her deposits to the bank, helped her fill out checks to pay her bills and gave her advice when salesmen came to her house. He kept his car in her garage without charge, and did not ask to be compensated for his labor, the materials he purchased when making repairs, or for the food he provided.

According to Burson, Nellie gave him a check for $2,000 dated January 21, 1972, telling him that she wanted him to have it for the things he did for her around the house. Burson used the $2,000 as a down payment on the purchase of a house. In 1973, following a general conversation in which Burson had mentioned he would like to get out of factory work and start a business of his own, Nellie gave him a check for $10,000 dated March 22, 1973, saying that she wanted him to have it so he could have his own business. Burson used the $10,000 to start a dry cleaning establishment in November, 1973. In June of 1973, Nellie gave Burson another check, this time for $6,000 saying that he should get a new car so he could take her for more rides. Shortly thereafter he purchased a 1971 Cadillac for $3,900.

Burson also testified that sometime during 1971 or 1972, Nellie came to his house with an envelope containing seven securities, including five investment certificates representing $34,900 deposited in various savings institutions.[2] Nellie had previously signed her name as transferor on the back of each of the five certificates. She told Burson she wanted him to have the certificates because he was the only friend and relative she had. She brought a pen with her and instructed him to place his name on the instruments as transferee, saying that she would not leave until he did. He

---

[2] Two of the instruments were certificates, dated 1929 and 1930, representing 83 shares in an investment corporation, in the name of "Arlie McCarl," a previous husband of Nellie. These certificates were not endorsed by Nellie, who told Burson to check for her to see if they were worth anything. Burson made no inquiries, and turned these certificates over to the administrator after Nellie died. Burson also testified that Nellie gave him a deed, saying that she wanted him to have her house. Burson knew that the deed only conveyed a life estate to Nellie, and he gave the deed to the administrator. Neither the old certificates nor the deed are in issue here.

then printed his name on each instrument, but the lines for designating the date and a witness were left blank. Burson placed the certificates in a lock box in his closet and did not at any time attempt to transfer ownership to his name on the books of the institutions involved. According to Burson, these securities were Nellie's only source of income other than a small social security pension and $59 she received monthly from the sale of a trailer, and he said, "I sure wasn't going to cash them in and keep her from getting those checks." Nellie did continue to receive all the interest from the securities until her death.

At the time Nellie died, Burson had in his possession five checks for interest on the securities, totaling $523.90, which he had not yet deposited in Nellie's bank account and which he voluntarily turned over to the administrator. During cross-examination of Burson, the following colloquy took place:

"Q. So actually, during the lifetime of Nellie Heilman you made no claim at all to these certificates?

A. Do you mean, did I want to collect any money on them? Is that what you mean, Bob? No. No way.

Q. You didn't claim any ownership on those certificates in her lifetime?

A. No.

Q. It is only after her death that you are claiming them, is that right?

A. Right.

Q. In other words, you think it was Nellie Heilman's intention that you have them after her death, is that correct?

A. All I know is, Nellie brought them to me and says, 'Bill, I want you to have them.' And I wasn't about to cash them in while she was living, while she was getting any dividends, or anything like that?"

Burson also related conversations with Mrs. Ebeling and with her son-in-law, Hayden O. Parks, after Nellie's funeral at which time he told them that Nellie had given him her securities but they weren't notarized, and if his attorney advised that they weren't "legal" he would turn them over to Mrs. Ebeling. This testimony was contradicted by Mrs. Ebeling, her daughter and son-in-law, her grandson and Arlene Gauger, all of whom said that Burson had said that he would give Mrs. Ebeling the securities which Nellie had given him to keep for her. Hayden Parks testified that he later had a telephone conversation with Burson during which Burson said he was going to keep the certificates because Nellie wanted him to have them. In the trial court's memorandum opinion, Burson's version of these conversations was viewed as more believable, and the court found that his statements did not constitute a disclaimer of ownership.

Two other witnesses, both friends of Burson, also testified briefly. Ruth Rifley said that in March or April, 1973, Burson showed her his bank book and a deposit slip reflecting the $2,000 check from Nellie which he told her he had borrowed from Nellie and would pay back by doing some work for her. Burson admitted this conversation, but explained that he had intentionally misled her because he thought she was prying into his affairs.

Jackie Clement related a conversation with Burson at the latter's home in December, 1972, when he showed her the five securities endorsed by Nellie. Burson told her that Nellie gave them to him because she liked him and wanted him to have them.

On appeal, the first issue concerns burden of proof. Burson argues that, when a negotiable security is in the possession of a person claiming ownership, an adverse claimant has the burden of proving that the security belonged to the decedent at the time of death. Burson relies upon *In re Estate of Hill* (1st Dist. 1963), 42 Ill. App. 2d 396, 192 N.E.2d 429, where the court held that the estate failed to establish a *prima facie* case of ownership of a stock certificate which was still registered in decedent's name but was in the possession of his widow, the claimed donee.

■■ ■ Since the case before us, unlike *Hill*, involves an alleged fiduciary relationship, we believe the administrator established her *prima facie* case by evidence that the securities were registered in the decedent's name, that the person in possession of the disputed property occupied a fiduciary relationship with the decedent, and that the one in possession claimed to have received the securities and checks as a gift. (*Cf. In re Estate of Hackenbroch* (1st Dist. 1962), 35 Ill. App. 2d 155, 182 N.E.2d 375.) The presumption of law that one in possession is *prima facie* entitled to remain in possession until the contrary is proved (*In re Estate of Jones* (1st Dist. 1934), 274 Ill. App. 616) is overcome by evidence that one in possession was a fiduciary. Where a fiduciary relationship is involved, the claimed gift is presumptively fraudulent and void. (*In re Estate of Skinner* (3d Dist. 1969), 111 Ill. App. 2d 267, 250 N.E.2d 295.) Once the administrator here proved her *prima facie* case, the burden of proof shifted to Burson to establish all essential facts of a valid gift, and his evidence must be clear, convincing and unequivocal as to both the claimed intent and claimed delivery. (*In re Estate of Jarmuth* (1st Dist. 1946), 329 Ill. App. 619, 70 N.E.2d 336.) Mere possession is not sufficient, and gifts that are first asserted after the death of the donor are regarded with suspicion. *In re Estate of Skinner.*

■■ On the basis of Burson's unchallenged testimony concerning his association with Nellie, the trial court found that a confidential or

fiduciary relationship existed between Nellie and Burson. We agree. A fiduciary relation arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. (*In re Estate of Jarmuth.*) Burson's testimony clearly showed that Nellie looked to him for advice and help in managing her business affairs, and that she relied upon him for the maintenance and care of her property and that he saw to many of her everyday needs for food, care and companionship.

Our next question is whether Burson sustained his burden of proving a valid *inter vivos* gift of the three checks. There is no evidence that Nellie intended anything other than a *bona fide* gift of $18,000 to Burson. Clearly he asserted his ownership of the disputed funds during Nellie's lifetime since he cashed the checks and used the proceeds to purchase a house, a business, and a car. As far as is known, Nellie never claimed any financial interest in those undertakings although the evidence shows that she knew about Burson's dry cleaning business and his car.

■■ The only questionable circumstance is that raised by Ruth Rifley's testimony relating to the $2,000 check. The trial court heard Burson's explanation of his statement to Ruth Rifley that the $2,000 was a loan to be paid back by work, and was satisfied with Burson's testimony. Furthermore, there was ample uncontradicted evidence that Burson performed extensive personal services for Nellie without receiving compensation for his labor or materials purchased. We believe that the trial court correctly found that the $18,000 was a valid gift to Burson.

■■ A more difficult question is whether the securities were correctly found to be an *inter vivos* gift. Viewing all the evidence in the light most favorable to Burson, we are not persuaded that he met his burden of proof as to that transaction. Serious uncertainties as to Nellie's intention are raised by several undisputed facts. First the securities constituted nearly all of her assets. After the transfer, she continued to receive the income from the securities for the remainder of her lifetime. Burson made no attempt to assert any ownership rights while Nellie was alive. (See his testimony quoted above.) Furthermore, while the chronology of the various transactions is not clear, the two checks, one for $10,000 dated March 22, 1973, and one for $6,000 in June of 1973, were certainly dated after Nellie had given Burson the securities. This is borne out by the testimony of Jackie Clement who saw the securities in Burson's home in December, 1972. If Nellie had intended to make an *inter vivos* gift of the securities, would Burson have needed the additional money to start a business or to purchase a car?

The conduct of both Nellie and Burson did not indicate with any certainty whether Nellie's intention was to have Burson hold the certificates for safekeeping, or to make a testamentary gift to him, or to

make an *inter vivos* gift to him with a reservation of income for her life.

■■ The trial court found that Nellie and Burson agreed that she was to continue to receive the income, but there was no evidence contrary to Burson's repeated denials that any such agreement was made. In the absence of any express agreement concerning a reservation of income, continued receipt of interest and dividends by Nellie raises a question whether an *inter vivos* gift was intended. *In re Estate of Skinner.* See also *In re Estate of Morys* (1st Dist. 1973), 17 Ill. App. 3d 6, 307 N.E.2d 669; *In re Estate of Waggoner* (3d Dist. 1955), 5 Ill. App. 2d 130, 125 N.E.2d 154.

■■ Although the trial court viewed Burson's testimony with "caution, circumspection and skepticism," the court said it could not disregard his testimony as to his transactions with Nellie. We believe this approach was correct as to the checks where the actions of both Nellie and Burson were fully consistent with an intention to make an *inter vivos* gift. However, as to the securities, conflicting inferences may be drawn from the evidence. In such a case, the donee's unchallenged testimony, standing alone, is insufficient to overcome the presumption of fraud that arises where a fiduciary relation exists between the donor and donee. (*In re Estate of Skinner.*) This rule was explained in *In re Estate of Hackenbroch* as follows:

> "In a citation proceeding, the sole testimony of a donee as to what was done or said to him by a deceased donor is of questionable credibility and should be carefully scrutinized, as direct disproof of such declarations and conduct of the deceased donor is rarely possible. Such testimony should be considered, but sufficient corroborative evidence is required so as to make the proof of a gift clear and convincing." 35 Ill. App. 2d 155, 162.

■■ Here the corroborative evidence consisted of Burson's possession of the endorsed securities and Jackie Clement's account of Burson's version of the transaction. Since the latter testimony is based on Burson's statements, it is entitled to little weight as independent corroborative evidence of the gift.

■■ Mere possession of the securities was not sufficient to prove a valid gift. (*Pocius v. Fleck* (1958), 13 Ill. 2d 420, 150 N.E.2d 106; *In re Estate of Morys.*) The additional fact that Nellie endorsed the securities is also an inconclusive indication of donative intent. It is obvious from the record that both Nellie and Burson were not versed in the legal technicalities required to execute documents, and the endorsements could have been thought necessary to accomplish a testamentary gift or a mere transfer of possession for safekeeping.

In summary, we believe the evidence as to the securities leaves so many doubts unresolved that it was error to say that Burson had discharged his

burden of proving a valid *inter vivos* gift of the securities. We must therefore reverse the judgment of the trial court as to the securities, and remand for entry of an order consistent with the views expressed in this opinion. We affirm the judgment of the trial court as to the checks.

Affirmed in part; reversed in part, and remanded.

ALLOY, P. J., and STOUDER, J., concur.