LORRAINE JENSEN GRAU, Claimant-Appellee, *v.* VIRGINIA P. DOOLEY, Adm'r of the Estate of James A. Dooley, Deceased, Respondent-Appellant.

First District (2nd Division)    No. 80-2590

Opinion filed December 29, 1981.

Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago (Barnabas F. Sears and Wayland B. Cedarquist, of counsel), for appellant.

Cherry & Flynn and William J. Harte, Ltd., both of Chicago (Myron M. Cherry, Peter Flynn, and William J. Harte, of counsel), for appellee.

JUSTICE PERLIN delivered the opinion of the court:

This appeal concerns a claim against the estate of the late James A. Dooley, a justice of the Illinois Supreme Court, who died intestate on

March 5, 1978, in Bal Harbour, Florida. Decedent's widow, Virginia P. Dooley, was appointed administrator on March 10, 1978. On September 8, 1978, Lorraine Jensen Grau, a longtime friend and employee of decedent, filed a claim against the estate for delivery of 13,000 shares of the capital stock of Farmers Group, Inc. This claim was based on an "Assignment Separate From Certificate" which Grau stated decedent had executed and delivered to her shortly before his death. The estate disputed the claim, and Grau brought suit. After a three-day bench trial, the trial court upheld Grau's claim and entered judgment in her behalf for 13,000 shares of the stock. In an amended final order, the court ordered the estate to transfer to Grau 13,000 shares, together with the dividends paid or accrued on the stock since February 25, 1978, which the court previously had determined was the date on which decedent had signed and delivered the assignment. The estate's motion for a rehearing was denied, and this appeal followed.

The estate has advanced four arguments in support of its request for reversal or, in the alternative, a new trial. Upon our review of the briefs and argument in this cause, however, we believe that the estate's appeal presents a single issue: whether the trial court's judgment was against the manifest weight of the evidence. For the reasons which follow, we affirm the judgment of the trial court.

Grau testified that she had worked for decedent on a regular basis between 1943 and 1945, between 1950 and 1953, and from early 1976 until his death in 1978. Throughout their acquaintance, Grau did occasional work for decedent and maintained a social relationship with him. In January 1976 Grau became involved with decedent's campaign for the supreme court, worked long hours on his behalf and acted as his campaign manager. During the summer of 1976, Grau also resumed her former duties as decedent's personal secretary. In that capacity she took care of "all the details, all the minutia[e]" of decedent's office at 111 West Washington and handled the secretarial and administrative chores relating to his law firm and his property "Yellow Bayou." Grau kept track of decedent's personal affairs, chauffeured him, saw to it that routine bills were paid according to decedent's instructions and performed a multitude of other tasks for him. Grau often worked late for decedent, sometimes until 2 or 3 a.m., and regularly dined with him on business at the Chicago Athletic Association, a fact which was confirmed by the association's headwaiter, Stanley Nadvodnik.

After decedent was elected to the supreme court in November 1976, he moved his law office from a large suite at 111 West Washington to a small space in the offices of attorney Leonard Ring at the same address. Decedent sold his practice and Grau worked at that location in helping

him with his personal matters and in winding up his practice. Decedent's court chambers were located at the Chicago Civic Center.

According to both Grau and several other witnesses, decedent prized her dedication, loyalty and integrity and considered her his friend and "right arm" as well as his employee. In the four years before his death, decedent made at least four gifts of expensive jewelry to Grau (a solid gold ring and necklace, a pair of diamond earrings and a diamond brooch) and attempted to name her one of the beneficiaries of his interest in his law firm's pension plan.[1]

One of decedent's assets consisted of 11,681 shares of common stock in Farmers New World Life Insurance Company. Late in 1977 Farmers New World announced to its stockholders a proposed merger into Farmers Group, Inc., another insurance company, which offered 2.3 shares of its stock in exchange for each share of Farmers New World. Under the terms of the merger, decedent would receive 26,866 shares of Farmers Group stock. When Grau informed decedent of the merger notification in December 1977, decedent "quite casually" told her, "I'll give you some of that."

On January 19, 1978, after the merger had been approved, Grau prepared a list of decedent's certificates of stock in Farmers New World. Hermina Brandt, a secretary at Paine, Webber, Jackson & Curtis, a brokerage house with offices in Chicago, testified that on January 20, 1978, Grau personally delivered to Paine, Webber decedent's 26 certificates of stock in Farmers New World so that the new share certificate in Farmers Group could be issued.

On or about January 19, Grau advised decedent that he was to receive approximately 26,000 new shares in exchange for his 11,000 old shares. According to Grau, decedent said, " 'I'll give you half.' Then he dropped it." Grau was "ecstatic" and "could hardly believe it" because decedent also informed her that he had named her one of the beneficiaries of his pension fund. Grau said, "Jim, this is fantastic," and he replied, "You deserve it." Grau, however, did not pursue the matter further with decedent because she did not think that he had made a firm commitment to her and she did not want to appear to be "beg[ging] for a gift."

Shortly after this conversation, decedent went to San Francisco for a meeting of the International Academy of Trial Lawyers. He caught cold and went to Florida to visit his wife, Virginia, from whom he had separated in 1973, and their adopted daughter, Ginny.

---

[1] We note that another division of this court has affirmed a trial court's judgment declaring the alleged 1978 beneficiary assignment in favor of Grau and others to be invalid and ineffective because of decedent's failure substantially to comply with the formalities required by the plan. (*Dooley v. James A. Dooley Associates Employees Retirement Plan* (1981), 100 Ill. App. 3d 389, 426 N.E.2d 1028.) That opinion, however, leaves no doubt that decedent had taken the initial steps to change the designation of his beneficiaries.

In June 1977 Virginia P. Dooley had filed a praecipe and summons for dissolution of their marriage. A complaint for dissolution was prepared but never filed. In these proceedings decedent was represented by his longtime friend, John Cusack, who took Virginia Dooley's deposition in January 1978.

Decedent returned to Chicago on February 20, 1978. John Cusack testified that on February 21, 1978, decedent told him, "I have got 26,000 shares of that Farmers Group Stock, and I am going to give Lorraine [Grau] 13,000 shares." Although Cusack was not aware of the value of the stock, he told decedent, "that's a very gracious gift," or words to that effect, because, in Cusack's opinion, "13,000 shares of anything is gracious * * *."

Cusack testified further that on February 22, 1978, decedent said, in substance, that he had asked Grau to prepare the assignment for the stock. Cusack could not recall whether he had seen an assignment on that day. His testimony that he had a meeting with decedent on February 22 was corroborated by an entry in his appointment book which was introduced into evidence. At the time of trial, Cusack had two claims pending against the estate for $115,000 in legal fees. He expected Grau to testify in support of one and possibly both of his claims.

Grau testified that on Thursday evening, February 23, 1978, she had dinner with decedent at the Chicago Athletic Association. Decedent asked Grau, "Did you write up that certificate yet." Grau replied that she had not prepared the assignment because he had not yet instructed her to do so. Decedent said, "Get it and I'll sign it before I leave." Decedent planned to fly back to Florida on Saturday, February 25.

Grau testified that she typed the assignment on a Paine, Webber "Assignment Separate From Certificate" form (which was necessary because the new stock certificate in Farmers Group was still in transit) at her home on the morning of February 24, 1978. Several weeks before that date, Grau had taken some Paine, Webber forms to her home in order to process an unrelated transaction of her own. In typing the assignment, Grau did not include either the certificate number, which she did not know until March 3, 1978, or decedent's account number at Paine, Webber.

Grau's testimony at trial regarding the details of how and where she typed the assignment was impeached by her deposition testimony. At her deposition Grau stated that she had typed the entire assignment, including the new certificate number (FBU 27770) and decedent's account number (CG-76510), at one sitting in her office at 111 West Washington on February 24. Grau and the estate, however, stipulated to excerpts from the deposition of an examiner of questioned documents, David J. Purtell, which established that the certificate and account numbers, although

aligned with each other, were not in alignment with the rest of the characters appearing on the assignment and therefore could not have been typed at the same time. Documents obtained from Paine, Webber indicated that the share certificate in Farmers Group (containing the new certificate number) did not arrive at Grau's office until March 3, 1978. After Grau reviewed Purtell's deposition and the Paine, Webber documents, she remembered that she had not prepared the assignment at one sitting and corrected her deposition so that it accorded with her new recollection.

Since decedent had informed Grau that he was going to give her half of the approximately 26,000 new shares, Grau typed "13,000" on the form. The new certificate showing the exact number of shares had not yet arrived, and Grau testified that she "didn't want to be greedy and figure it out to the last percentage point."

Later in the morning on February 24, 1978, Grau brought the typed assignment to the 111 West Washington office with her. She took the original and a copy to decedent at his chambers, together with other papers he had requested, but decedent was not then available. She left the copy at his chambers and kept the original to be signed when she met him the next day.

John Cusack testified that he met with decedent in his chambers later in the afternoon of February 24. Decedent told Cusack that "he had Lorraine prepare a stock assignment covering the thirteen thousand (13,000) shares of the Farmers Group stock that he was giving her." Decedent showed Cusack the unsigned copy of the assignment which Grau had left with him. At trial Cusack remembered three things about the assignment—the name of the donee, "Lorraine Jensen Grau," the identification of the stock, "Farmers Group, Inc.," and the number of shares, "13,000." Cusack could not recall whether the assignment was dated or contained a stock certificate number. Cusack's appointment book noted a 4:30 p.m. meeting with decedent "re: Lorraine stock gift."

John Cusack's brother, Circuit Court Judge Robert Cusack, who had been a very close friend of decedent for many years and had met Grau, through decedent, in the early 1950's, also testified. Cusack stated that he had a lengthy private conversation with decedent in Cusack's car outside of decedent's Harbor Point Towers apartment late in the evening on February 24, 1978. In the course of that conversation, decedent mentioned his marital problems to Cusack, who assured him that his friends would stand by him. Cusack told decedent that Grau "was always ready, willing and able to help" him and characterized her as "the best friend in the world anybody could ever have had * * *." Decedent replied, "I know that," and asked Cusack, "You know that Farmers?" Cusack answered, "Yes," understanding decedent to be referring to his stock in Farmers

New World Life Insurance Company about which he had often bragged to Cusack. According to Cusack, decedent said, "Well, I gave her a hunk of it." Cusack said, "Fine." Cusack testified that he thought decedent had already given her the stock.

Cusack did not memorialize this conversation or mention it to anyone until he was interviewed by one of Grau's attorneys near Easter 1980. Cusack testified that he never discussed what decedent confided in him with anyone, not even his brother.

Grau testified that per decedent's instructions, she brought the assignment and some other papers with her when she picked him up on the morning of February 25 to drive him to the airport. Decedent signed the assignment in Grau's car outside his apartment while his housekeeper, Charlotte Thon, was assembling his luggage. Thon testified that she remembered decedent signing something as he sat in Grau's car but she did not see what it was. The parties stipulated that the signature on the assignment was genuine, and the assignment was admitted into evidence.

Grau took the executed assignment, which was complete except for the new certificate number and account number, and placed it in the office desk drawer where she also kept index cards showing decedent's investment holdings. On or about March 1, 1978, she was notified that Paine, Webber's Chicago office had received the new Farmers Group certificate. At decedent's suggestion, Grau advised Paine, Webber to mail the certificate to his office. Hermina Brandt confirmed the details of this conversation.

The certificate arrived on March 3, 1978. Grau typed out a new index card reflecting the new certificate, and also typed out the certificate number and decedent's Paine, Webber account number on the assignment. In a telephone conversation that evening, Grau advised decedent that the certificate had come in and that she had typed the numbers on the assignment.

Grau did not show the gift on the new index card. She testified that this was because the stock covered by the new certificate—of which only part was Grau's—was still in decedent's name on the Farmers Group books. For the same reason, although Grau took the assignment home with her, she left the certificate in the office's locked file cabinet together with other stocks and bonds.

Decedent died two days later, on March 5, 1978, and his widow, Virginia P. Dooley, immediately instructed both Grau and attorney Leonard Ring that Grau was not to touch anything in decedent's office at 111 West Washington or enter the office until further notice. On March 6, 1978, Ring informed Grau that he would be counsel for the estate. Grau did not mention the gift to Ring because she was "still in a state of shock" over decedent's unexpected death. Ten or twelve days after the funeral,

however, she showed the assignment to John Cusack who told her that she would have to file a claim and advised her to inform the estate. Grau rejected this advice and decided to retain a lawyer before she notified the estate of her claim. According to Grau, selecting an attorney required a substantial amount of time because most of the lawyers she knew were personal injury specialists who were not necessarily conversant with probate matters.

Grau knew that she had six months within which to file her claim against the estate. On June 30, 1978, which was more than two months before Grau filed, the guardian of the estate of decedent's daughter, Virginia Ann Dooley, brought suit against Grau and others attacking decedent's designation of beneficiaries to his pension plan.

Grau also called the administrator, Virginia P. Dooley, who testified that she had no information with which she could dispute the making of the gift. She also stated that in the late 1960's decedent had brought 225 stock powers to their home and signed them in blank in her presence. Grau had no access to these powers and, to the administrator's knowledge, was not aware of their existence. Over Grau's objection, these powers, which did not include any Paine, Webber forms (the form on which the assignment was executed), were introduced into evidence. Grau testified that she did not know that decedent kept any stock powers signed in blank and had never seen any.

The estate presented no witnesses but introduced a series of exhibits purporting to demonstrate that Grau had signed, assisted in preparing or tacitly approved various documents which failed to disclose the existence of the gift.

After hearing all the evidence, the trial court entered judgment in favor of Grau. At the time the gift was made, the stocks had a market value of approximately $300,000.

■■ The estate's appeal presents, in substance, a single issue: whether the trial court's judgment was against the manifest weight of the evidence. When a survivor claims that a person, now deceased, made a gift of valuable property in his lifetime, the survivor must prove by clear, satisfactory, unequivocal and convincing evidence that the decedent intended to make the gift and that he delivered the gift. (*Dudley v. Uptown National Bank* (1960), 25 Ill. App. 2d 514, 521, 167 N.E.2d 257.) In our judgment both intent and delivery were established by the requisite degree of proof.

■■ The evidence that decedent intended to give Grau a substantial portion of his stock in Farmers Group was clear and convincing. Grau testified that on three different occasions decedent told her he was going to make a gift of the stock to her. According to Grau, decedent said he would give her half of the approximately 26,000 shares he expected to

receive through the corporate merger. Two other witnesses, Robert Cusack and John Cusack, also testified that decedent had expressed an intention to give Grau some of his stock in Farmers. John Cusack testified that decedent specifically advised him on February 21, 1978, that he had 26,000 shares of Farmers Group stock and that he was going to give Grau 13,000 shares. He also stated that on February 24, 1978, decedent told him that he had instructed Grau to prepare an assignment for the 13,000 shares and showed him an unsigned copy of the assignment on which Grau's name, the identification of the stock and the number of shares appeared.

■■ Grau testified that decedent signed the assignment while he was sitting in her automobile on the morning of February 25, 1978. The estate stipulated to the genuineness of the signature. While Grau did not in so many words testify that decedent handed her the assignment, delivery of the executed assignment reasonably may be inferred from Grau's testimony that she locked the signed assignment into her desk drawer at decedent's personal office. Grau's possession of the executed assignment itself raises a presumption that it was delivered to her, a presumption which has been applied even where the article in question "was accessible to [the donee who] might have purloined it * * *." (*Martin v. Martin* (1897), 170 Ill. 18, 33, 48 N.E. 694; *O'Connor v. Messenger* (1913), 183 Ill. App. 1, 11; *In re Estate of Hill* (1963), 42 Ill. App. 2d 396, 400-02, 405-06, 192 N.E.2d 429.) The estate presented no evidence to rebut this presumption.

The estate attacks the credibility of Grau and the Cusacks on a number of grounds, most of which do not warrant individual comment since they are unrelated to the material issues of intent and delivery. (*Kapraun v. Kapraun* (1957), 12 Ill. 2d 348, 355, 146 N.E.2d 7.)[2] The estate points to the inconsistencies between Grau's trial testimony and her deposition testimony regarding where she typed the assignment and whether the certificate number and account number were typed at the same time as the rest of the assignment. Grau, however, offered a reasonable explanation for these inconsistencies.

Grau testified that her memory is not "infallible" and that at the time of the deposition it did not seem significant to her to remember every detail of how and where the assignment was typed. Grau characterized

_____

[2] We cannot accept the estate's contention that John Cusack's testimony was not entitled to credence simply because another trial court may have found unpersuasive Cusack's testimony on an unrelated matter concerning decedent's attempt to change the designation of beneficiaries of his retirement plan. (See *Dooley v. James A. Dooley Associates Employees Retirement Plan* (1981), 100 Ill. App. 3d 389, 395-96, 426 N.E.2d 1028.) In this case the trial court accepted Cusack's testimony. As in *Dooley*, "[t]he credibility of witnesses in a bench trial is a matter within the province of the trial court which saw and heard them, and its findings will not be disturbed unless against the manifest weight of the evidence. [Citations.]" 100 Ill. App. 3d 389, 395-96.

the deposition as "rough" and stated that there was a "great deal of arguing back and forth." She "became more nervous" as the deposition progressed and even cried during it. We note, however, that once Grau's recollection was refreshed by the knowledge that the numbers were not typed at the same time as the rest of the assignment, Grau was able to recall the precise circumstances and corrected her deposition so that it conformed to the facts as she then remembered them. Although the estate argues that in reviewing a deposition a deponent may correct only a court reporter's errors and that Grau's corrections were therefore improper alterations of her testimony, we cannot agree.

Supreme Court Rule 207(a) provides, in part, that "[a]ny changes in form *or substance* which the deponent desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the deponent for making them." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 110A, par. 207(a).) In permitting a deponent to make changes in the substance of a deposition, Rule 207(a) accords with prior practice in Illinois (see *Harrison v. Thackaberry* (1911), 248 Ill. 512, 518, 94 N.E. 172) and with the interpretation Federal courts have given Rule 30(e) of the Federal Rules of Civil Procedure from which our rule was derived. *Allen & Co. v. Occidental Petroleum Corp.* (S.D.N.Y. 1970), 49 F.R.D. 337, 340; *Colin v. Thompson* (W.D. Mo. 1954), 16 F.R.D. 194; see generally Manus, *Correcting The Deposition: Deponent's Rights*, 66 Ill. B. J. 648 (1978).

■■ Even if we accept that there were inconsistencies between Grau's deposition testimony and her testimony at trial, "[t]he fact that a witness, either a party or otherwise, has made out-of-court statements inconsistent with [her] sworn testimony, does not *per se* destroy the probative value of [her] testimony" or "render [her] testimony nugatory." (*Haynes v. Chicago Transit Authority* (1978), 59 Ill. App. 3d 997, 1003, 376 N.E.2d 680; *Reed v. Knol* (1972), 7 Ill. App. 3d 163, 287 N.E.2d 238.) This is particularly true where, as here, the inconsistencies are not material to the principal factual issues of the case.

What is critical is that Grau testified that at the time decedent signed the assignment everything which now appears on it was present then except for the new stock certificate number, which was not known until March 3, 1978, and the Paine, Webber account number which, presumably, Grau did not have at home where she typed the assignment.[3] John Cusack's testimony corroborated Grau's testimony that the name of the donee, the identification of the stock and the number of shares had been

---

[3] At oral argument, the estate conceded that the inclusion of the new share certificate number was not necessary to effect a valid assignment of the stock. Once decedent delivered the executed assignment to Grau, she had an irrevocable right to "do the things necessary in completing the transfer." *In re Estate of Hill* (1963), 42 Ill. App. 2d 396, 400, 192 N.E.2d 429; see also *Home for Destitute Crippled Children v. Boomer* (1941), 308 Ill. App. 170, 187, 31 N.E.2d 812.

typed on the assignment before decedent signed it. On all material issues Grau's testimony and that of the Cusacks was clear and convincing.

A significant portion of the estate's attack on Grau's credibility focuses on her silence after decedent's death and her preparation or tacit approval of documents on which the entire 26,866 shares of Farmers Group, Inc., were listed as decedent's assets.

Following decedent's death, Grau did not notify either his widow or the estate's attorney of her claim because, according to Grau, she was still in a state of shock over his death. Ten to twelve days later Grau mentioned the gift to John Cusack but rejected his advice to inform the estate immediately of her claim. Grau knew that she had six months in which to file a claim and spent part of that period attempting to locate counsel experienced in probate.

The estate also introduced into evidence five exhibits purporting to demonstrate that Grau failed to disclose the gift after decedent's death. We have examined these exhibits and have reviewed the testimony pertaining to them and find that they do not possess the probative significance the estate claims for them. Exhibit R-2(2) is a partial list of decedent's assets which does not include his stocks and bonds. Exhibit R-3, a ledger of dividends on decedent's stocks which Grau maintained, merely attributes to decedent two dividends on the Farmers Group stock which were declared before the gift was made. Exhibit R-4 is the inventory of decedent's estate which the administrator filed with the probate court on July 26, 1978. Grau did not prepare the inventory and testified that she did not recall seeing it before it was filed. Exhibit R-5 is a list of stocks and bonds compiled by representatives of the estate on May 2, 1978. Grau was provided with a Xerox copy of this list on May 2 but was not asked to review it. Grau received another copy of this list from the estate's attorneys late in August 1978, by which time the estate had already been informally apprised of Grau's claim. Exhibit R-2(1) is a Paine, Webber valuation of decedent's stocks and bonds as of February 28, 1978, prepared at the request of Grau and decedent's accountant who had been asked to make a list of decedent's assets in connection with the pending divorce proceedings. In April 1978 Grau noted on the list some differences between her records and Paine, Webber's but did not then comment on Paine, Webber's attribution of the entire 26,866 shares to decedent. As of the February 28 valuation date, the certificate was, as the list indicated, still in decedent's name on the books of the insurance corporation.

Neither Grau's silence nor her failure to correct or object to documents on which her gift was not listed precludes a finding that decedent made the gift. In *In re Estate of Toigo* (1969), 107 Ill. App. 2d 395, 246 N.E.2d 68, both the donee and the principal witness had signed and

formally filed a sworn inventory showing the stock in question to be part of the donor's estate. Both witnesses denied reviewing the inventory before signing it. The gift was not asserted until more than a year after the donor's death. "At no time * * * was there a disclosure that a gift of the stock had been made" and the donee had "remained silent about the gift" even during negotiations with relatives and "legal representatives of the estate of Harry Toigo" concerning other stock in the same family-owned company. The appellate court held that this "testimony of a negative nature," consisting of "inference and innuendo" could not defeat the gift. (107 Ill. App. 2d 395, 401.) Nor, in our opinion, should such inference and innuendo defeat the claim in the present case.

The evidence adduced at trial established the elements of a gift by the required measure of proof. Upon a review of that evidence, it cannot be said that the trial court's judgment in favor of Grau was against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

HARTMAN, P. J., and STAMOS, J., concur.