# Illinois Official Reports

## Appellate Court

---

*In re Estate of Weber*, **2021 IL App (2d) 200354**

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF SARA C. WEBER, Deceased (Botti Law Firm, P.C., Petitioner-Appellant and Cross-Appellee, v. Andrew W. Schmidt, Respondent-Appellee and Cross-Appellant). |
| District & No. | Second District<br>No. 2-20-0354 |
| Filed | July 7, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, Nos. 15-D-2306, 17-P-1094; the Hon. Paul M. Fullerton, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Aldo E. Botti and Jean Lasics-Wessels, of Botti Law Firm, P.C., of Oak Brook, for appellant.<br><br>Thomas A. Christensen and Alexandra N. Prejzner, of Huck Bouma PC, of Wheaton, for appellee. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Hutchinson and Zenoff concurred in the judgment and opinion.

## OPINION

¶ 1    Petitioner, Botti Law Firm, P.C. (Botti), represented Sara C. Weber in her dissolution of marriage proceedings. After Sara terminated Botti's representation, Botti filed a petition for the setting of final fees and costs pursuant to sections 508(a) and 508(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508(a), (c) (West 2016)). Sara filed a response and two affirmative defenses, seeking disgorgement and forfeiture of Botti's fees. Shortly thereafter, Sara died, and respondent, Andrew W. Schmidt, was appointed as the personal representative of Sara's estate. Schmidt then filed a section 508 petition for the setting of final fees and costs. The cases were consolidated, and the matter proceeded to trial. The trial court ordered the disgorgement of $16,313 in Botti's fees and the forfeiture of $125,472 in owed fees. Both Botti and Schmidt appealed. However, in his appellee's brief, Schmidt withdrew his cross-appeal. For the following reasons, we affirm in part, reverse in part, and remand for entry of judgment consistent with this opinion.

¶ 2                                I. BACKGROUND

¶ 3    Botti's representation of Sara began on November 6, 2015, when it filed Sara's petition for dissolution of her marriage to Karl Weber. Sara also filed an *ex parte* petition for an order of protection against Karl, whom she alleged was seeking control over her inheritance. Sara, who had suffered a stroke and was being treated for cancer, also alleged that Karl threatened to fire her caregiver, Mary Barton, without whom Sara could not function. In addition, Sara filed an emergency motion for a temporary restraining order. After a hearing, which included questioning Sara outside Barton's presence, the trial court granted the order of protection, declaring Sara and Barton to be protected persons and removing Karl from the home.

¶ 4    Karl filed an emergency petition for a temporary restraining order (TRO) against Sara, alleging that Sara was "not of sound mind or body" and was under Barton's influence and guidance. According to Karl, Sara had "taken or caused her caregiver to take unilateral actions to conceal, transfer, liquidate and distribute to others the parties' marital and business assets." In addition to various physical maladies and "memory and cognition problems," Sara suffered from "paranoia, severe depression, hallucinations, and *** suicidal ideations."

¶ 5    On November 23, 2015, an agreed order was entered enjoining Sara, Karl, and "anyone acting in concert with them, including Mary C. Barton, or their agents" from using any financial accounts or marital assets for anything other than ordinary and necessary living expenses, medical bills, or attorney fees. These prohibitions also applied to funds and assets of several businesses that Sara and Karl owned. Those enjoined were also prohibited from encumbering such assets. They were ordered to provide monthly accountings of funds used. Shortly thereafter, the order of protection was vacated, and Sara's motion for a temporary restraining order was withdrawn.

¶ 6         On December 6, 2015, Karl's attorney, William Arendt, caused two banks to put holds on accounts owned by Sara, resulting in a petition for rule to show cause for indirect civil contempt. The trial court ordered the freezes lifted.

¶ 7         On June 9, 2016, Karl subpoenaed Barton's bank records from BMO/Harris Bank. On June 13, 2016, Botti filed an appearance on behalf of Barton. On June 16, 2016, Botti filed a motion to quash on behalf of both Barton and Sara, which was granted. Karl filed a new subpoena, addressing the issues from the first motion to quash. Another motion to quash, filed on behalf of Sara and Barton, was denied on October 21, 2016.

¶ 8         On June 10, 2016, Sara sought restraining orders against Karl, three of their children, and their son-in-law, Andrew Schmidt, arising out of a June 9 incident. Pursuant to a March 7, 2016, order, Karl had been granted permission to remove certain pieces of furniture, along with clothing, from the former marital residence. He did nothing to retrieve those items until June 7, when he informed Sara that he would get the items between 9 and 9:30 a.m. on June 9. Sara responded that the time and date did not work for her and that she would have all of the items on the front porch at noon on June 12. Nevertheless, Karl and the others showed up on June 9 and entered Sara's bedroom and "made demands upon Sara and Mary C. Barton," causing them "great emotional distress and fear for their safety." Sara accused them of taking items beyond those specified in the March order—including books, artwork, photos, and financial documents—and rummaging through her and Barton's personal effects. After an evidentiary hearing on July 15, the trial court found that Karl had violated the March order, and it issued a preliminary injunction prohibiting Karl from interfering with Sara in any way and from entering the former marital residence.

¶ 9         On June 17, 2016, the trial court had appointed attorney Susan Alvarado as guardian *ad litem* for Sara. On October 21, 2016, Alvarado reported to the court that neither Sara nor Barton had been made available to her, so she had interviewed neither. She had interviewed Karl and three of the couple's four grown children. Alvarado stated that "it appears to me that Mrs. Weber is being isolated or has chosen to isolate herself. I'm not able to say which of those two, what the reason is, but she is not being made available for me to speak to." Alvarado noted that she had heard reports of "extensive or unusual spending" and that Sara had recently taken up online gambling, although she acknowledged that this was hearsay. She had also been given information that Barton was issuing checks to workmen working on the former marital residence and that signed blank checks were sitting around the house. Alvarado found that, "to the extent that Mary Barton is involved in Mrs. Weber's life, I think that's odd. I think it's odd that I'm not allowed to speak to them."

¶ 10        In November 2016, Sara filed an emergency motion for a bifurcated judgment in the dissolution proceeding, citing her impending death. The trial court granted the motion and entered a judgment of dissolution on January 23, 2017, reserving all financial matters. Karl died one week later, and Sara and Karl's daughter Karen Weber was appointed as personal representative of Karl's estate.

¶ 11        In March 2017, Karen filed an emergency motion for injunctive relief and an emergency petition for an order of protection on behalf of Sara and against Barton. The trial court, Judge Wilson, granted the emergency motion for injunctive relief but denied without prejudice the emergency petition for an order of protection. All of Sara's accounts were frozen, and Barton was ordered to return all financial information and prohibited from any access to Sara's finances. The order of protection, ordering Barton to stay away from Sara, was granted that

- 3 -

day in another courtroom, and Barton was removed from Sara's home. Sara and Karl's daughters became responsible for her care.

¶ 12    On March 9, 2017, Sara terminated Botti's representation. Botti continued to represent Barton, filing on her behalf a motion to dissolve the temporary restraining order and a limited scope appearance. Botti also withdrew as Sara's counsel.

¶ 13    In April 2017, Botti filed a petition for the setting of final fees and costs. Sara died in May 2017, and Schmidt, the personal representative of Sara's estate, filed a response and two affirmative defenses, seeking disgorgement and forfeiture of Botti's fees. The first affirmative defense alleged that, pursuant to the Illinois Rules of Professional Conduct of 2010, Botti owed Sara a duty of loyalty and independent judgment and a duty to avoid conflicts of interest. However, Botti "knew or reasonably should have known" that Barton's interests "were directly adverse to" Sara's interests and that there was a "significant risk" that its representation of Sara would be "materially limited" by its representation of Barton. Botti "took actions on behalf of Barton that were adverse to Sara" while Botti was retained to represent Sara. Botti's representation of Barton "constituted a conflict of interest and rendered void the Attorney-Client Agreement between Sara and Botti." The second affirmative defense alleged that Botti breached its "duties of loyalty and independent judgment owed to Sara" by billing Sara for work performed on behalf of Barton "without Sara's permission or consent." Botti "frequently and regularly communicated with Mary C. Barton, to the exclusion of Sara" and "incurred fees and billed Sara for its communications with Mary C. Barton, which were not authorized by Sara." Botti took direction from Barton regarding Sara's representation without conferring privately with Sara and acted on that direction without Sara's authorization, thereby incurring fees for which Sara was billed.

¶ 14    Shortly thereafter, Schmidt filed a petition for the setting of final fees and costs, alleging that the majority of services performed by Botti were "unreasonable and unnecessary" and "did not materially benefit" Sara. Botti's hourly rates were "unreasonable," and its fees were "excessive." A conflict of interest associated with Botti's representation of Barton rendered the attorney-client agreement between Sara and Botti void. Therefore, the petition sought a refund of some of the fees already paid to Botti and a reasonable amount of final fees. The cases on the two fee petitions were consolidated, and Judge Wilson *sua sponte* transferred the case to Judge Paul Fullerton, who presided over the evidentiary hearing on the fee petitions.

¶ 15    In its extensive oral ruling, the trial court concluded:

> "But we do know or this court knows from the evidence that when the Botti Law Firm first came into this case in October of 2015 to represent Sara Weber, the Botti Law Firm was made aware of allegations that Mary Barton was unduly influencing Sara Weber. And the evidence was clear that at the time that the Botti Law Firm came into the case, Karl Weber was filing petitions or making statements or making allegations of these unduly influence—undue influence, and it was clear that the Botti Law Firm, when it took representation of Sara Weber, there were [*sic*] at least a potential of a conflict between Sara and Mary.
>
> Now, Sara Weber needed representation and it was her right to chose [*sic*] her counsel and her right to chose [*sic*] the Botti Law Firm, and she did so.
> * * *

- 4 -

But there's no dispute that the Botti Law Firm's contact with his client, Sara Weber, began with Mary Barton, and the evidence was clear and overwhelming that Mary Barton always seemed to be on the present [*sic*] in Sara Weber's dealings with Mr. Botti. Some of this was explained by the clear health limitations of Sara Weber and her need for constant healthcare; however, with respect to Mary Barton and Sara Weber, it's also clear that the line between healthcare worker and an influence—an influencer of Sara Weber's daily behavior, that line was blurred.

\* \* \*

Now, this court believes there's no doubt that there was a conflict between Sara Weber and Mary Barton, and the only real issue for the court is to state when that conflict was such that it would violate a rule of professional conduct.

And the court finds that as of June 13, 2016, when the Botti Law Firm files its first official appearance on behalf of Mary Barton, that violates Rule of Professional Conduct 1.7 and it seemed that all the parties in this case, including perhaps, Judge Wilson, saw a conflict or a potential for a clear conflict except for the Botti Law Firm.

So the court's ruling is that the billings of the Botti Law Firm stop as of June 12, 2016 and as of June 13, 2016 the Botti Law Firm is not entitled to anymore billings or costs with respect to this matter.

\* \* \*

Final comments from the court, because one of the arguments by Andrew Schmidt was that the fees were unreasonable, unnecessary or—and/or excessive. The court finds that the billing rate is not unreasonable or excessive and it is finding that the Botti Law Firm would be entitled to the fees as previously stated from the beginning of—it's actually the end of October 2015 through June 12, 2016. And the time and the rate with respect to those fees is reasonable and customary so those—those are allowed.

The court does note that the five—four or five motions challenging Judge Wilson's appointment of the GAL, after the first two motions the remaining motions were excessive and unreasonable; however, that point is moot because those motions came after the June 12, 2016 date."

¶ 16    The trial court ordered the disgorgement of $16,313 in Botti's fees and the forfeiture of $125,472 in owed fees. This appeal followed.

¶ 17                                    II. ANALYSIS

¶ 18    Pursuant to section 508(a) of the Act, a trial court in a dissolution action, after notice and hearing, may make an award of attorney fees, not only between the parties, but between one of the parties and his or her former counsel. 750 ILCS 5/508(a) (West 2016). An award of attorney fees to a party's former attorney is governed by section 508(c) of the Act. *Id.* The determination of reasonable attorney fees and costs is within the sound discretion of the trial court. *Id.* § 508(c)(3). An abuse of such discretion occurs when a court issues a ruling that no reasonable person would agree with. *Cushing v. Greyhound Lines, Inc.*, 2013 IL App (1st) 103197, ¶ 308.

> "The court shall first consider the written engagement agreement and, if the court finds that the former client and the filing counsel, pursuant to their written engagement agreement, entered into a contract which meets applicable requirements of court rules

and addresses all material terms, then the contract shall be enforceable in accordance with its terms, subject to the further requirements of this subdivision (c)(3). Before ordering enforcement, however, the court shall consider the performance pursuant to the contract. *Any amount awarded by the court must be found to be fair compensation for the services, pursuant to the contract, that the court finds were reasonable and necessary.* Quantum meruit principles shall govern any award for legal services performed that is not based on the terms of the written engagement agreement (except that, if a court expressly finds in a particular case that aggregate billings to a client were unconscionably excessive, the court in its discretion may reduce the award otherwise determined appropriate or deny fees altogether).” (Emphasis added.) 750 ILCS 5/508(c)(3) (West 2016).

¶ 19    The trial court here clearly premised its ruling on Botti’s violation of Rule 1.7 of the Illinois Rules of Professional Conduct of 2010 (Rules), which provides:

“(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent.” Ill. R. Prof’l Conduct (2010) R. 1.7 (eff. Jan. 1, 2010).

¶ 20    Our supreme court has exclusive authority to prescribe rules governing attorney conduct and to discipline attorneys who violate those rules, which it has exercised by adopting the Rules, appointing the Attorney Registration and Disciplinary Commission (ARDC), and creating “ ‘a procedural scheme to enhance the ARDC in performing its duties.’ ” *Vandenberg v. Brunswick Corp.*, 2017 IL App (1st) 170181, ¶ 33 (quoting *People ex rel. Brazen v. Finley*, 119 Ill. 2d 485, 494 (1988)). This is “a comprehensive program to regulate attorneys and punish their misconduct.” *Brazen*, 119 Ill. 2d at 494. The Rules are mandatory, and any attorney who fails to understand them or follow them does so at his peril. *Vandenberg*, 2017 IL App (1st) 170181, ¶ 33.

¶ 21    However, while the Rules are mandatory, they “simply provide a framework for the ethical practice of law.” Ill. R. Prof’l Conduct (2010), Scope ¶ 16 (eff. Jan. 1, 2010). “Compliance with the Rules, as with all law in an open society, depends primarily upon understanding and voluntary compliance, secondarily upon reinforcement by peer and public opinion and finally, when necessary, upon *enforcement through disciplinary proceedings*.” (Emphasis added.) *Id.*

An attorney's failure to comply with an obligation or prohibition imposed by a Rule "is a basis for *invoking the disciplinary process*." (Emphasis added.) *Id.* ¶ 19. While a violation of the Rules may be relevant to the standard of care in a legal malpractice claim, the Rules themselves do not establish a separate duty or cause of action. *Prospect Funding Holdings, LLC v. Saulter*, 2018 IL App (1st) 171277, ¶ 36. The violation of a rule should not itself give rise to a cause of action against a lawyer, nor should it create any presumption in such a case that a legal duty has been breached. Ill. R. Prof'l Conduct (2010), Scope (eff. Jan. 1, 2010). "In addition, *violation of a Rule does not necessarily warrant any other nondisciplinary remedy*, such as disqualification of a lawyer in pending litigation." (Emphasis added.) *Id.* The power to discipline matrimonial lawyers is vested with the ARDC and our supreme court, not the trial court. See *In re Marriage of Landfield*, 209 Ill. App. 3d 678, 705 (1991).

¶ 22    The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies; they are not designed to be a basis for civil liability. Ill. R. Prof'l Conduct (2010), Scope ¶ 20 (eff. Jan. 1, 2010). The purpose behind the Rules can be "subverted" when invoked by opposing parties as procedural weapons. *Id.* "The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer *under the administration of a disciplinary authority*, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule." (Emphasis added.) *Id.*

¶ 23    Under section 508(c)(3) of the Act, the trial court may award attorney fees based on "fair compensation for the services [provided], pursuant to the contract, that the court finds were reasonable and necessary" (750 ILCS 5/508(c)(3) (West 2016)). Here, the trial court specifically addressed Schmidt's contention that Botti's fees were unreasonable, unnecessary, and/or excessive, finding that Botti's billing rate was "not unreasonable or excessive" and that the time and the rate with respect to those fees were reasonable and customary. However, the trial court based its fee determination strictly on its conclusion that, as of June 13, 2016, "when the Botti Law Firm files its first official appearance on behalf of Mary Barton, that violates Rule of Professional Conduct 1.7" such that Botti "is not entitled to anymore [*sic*] billings or costs with respect to this matter." The court merely determined that a conflict of interest arose on a certain date and that Botti was thus entitled to absolutely no fees for *any* services provided as of that date.[1]

¶ 24    This case is precisely the type of case that subverts the purpose behind the Rules. See Ill. R. Prof'l Conduct (2010), Scope ¶ 20 (eff. Jan. 1, 2010). The trial court's decision completely violates the supreme court's stated philosophy behind the Rules: "The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule." *Id.* In a disciplinary proceeding, the ARDC administrator must prove allegations of misconduct by clear and convincing evidence. *In re Cutright*, 233 Ill. 2d 474, 488 (2009); Ill. S. Ct. R. 753(c)(6) (eff. Mar. 18, 2016). An attorney is presumed innocent until proven guilty, and the burden of proving guilt rests with those making the charges. *In re Lane*, 127 Ill. 2d 90, 110 (1989) (*per curiam*) (Moran, C.J.,

---

[1]In its closing comments, the trial court also noted that three specific motions that Botti filed were "excessive and unreasonable" but, since the motions were filed after June 12, 2016, "the point is moot."

dissenting). The focus therein is on the ARDC proving attorney misconduct, and the burden is not on the attorney to prove that he or she did *not* commit misconduct.

¶ 25    The proceedings in the trial court here were ill-suited to a proper hearing regarding a conflict of interest. Even William Arendt, Karl's attorney, who testified for Schmidt in the fee petitions hearing, agreed that, if both clients (Sara and Barton) gave their consent to concurrent representation, "the rules allow for it." However, Botti was prevented by the Dead-Man's Act (735 ILCS 5/8-201 (West 2018)) from testifying about Sara giving any such consent.

¶ 26    The Dead-Man's Act provides:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***." *Id.*

The Dead-Man's Act bars only that evidence that the decedent could have refuted. *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005). "The purposes of the [Dead-Man's] Act are to protect decedents' estates from fraudulent claims and to equalize the position of the parties in regard to the giving of testimony." *Id.* However, "it is not intended to disadvantage the living." (Internal quotation marks omitted.) *Spencer v. Strenger Wayne*, 2017 IL App (2d) 160801, ¶ 17.

¶ 27    Here, Schmidt raised the issue of a conflict of interest in the response to Botti's petition for fees. In his brief, Schmidt argues that "*allegations* of undue influence placed Sara and [Barton] in an irrevocably adverse posture" and that "these *adverse allegations* *** created the conflict."[2] (Emphases in original.) He also states that there is "no evidence of any consent to the conflict by Sara (or Mary for that matter)." However, Schmidt also does not cite any evidence that establishes a *lack* of informed consent. Perhaps no such evidence of a lack of consent was raised because to have done so would have waived the Dead-Man's Act's application and invited Botti's testimony. See *In re Estate of Walsh*, 2012 IL App (2d) 110938, ¶ 35 (Dead-Man's Act protections may be waived "if anyone testifying on behalf of the estate testifies, or introduces other evidence, regarding a conversation or event covered by the Act. In that case, the door has been opened, and any interested person may testify about the same conversation or event.") In any event, raising allegations of a conflict of interest while preventing the refutation of such allegations is using the Dead-Man's Act as a sword, not a shield.

¶ 28    This shows why the disciplinary system, not a hearing on fee petitions, would be the proper forum in which to deal with the question of a conflict of interest. "In attorney disciplinary proceedings, *misconduct must be proved* by clear and convincing evidence." (Emphasis added.) *In re Storment*, 203 Ill. 2d 378, 390 (2002). Again, the focus therein is on the ARDC proving attorney misconduct, and the burden is not on the attorney to prove that he or she did *not* commit misconduct. In such a disciplinary proceeding, the personal representative would be neither prosecuting nor defending; thus, the Dead-Man's Act would not apply, and the attorney could testify regarding the decedent's giving of informed consent.

¶ 29    Again, the focus of the hearing on the fee petitions should have been "fair compensation for the services [provided], pursuant to the contract, that the court finds were reasonable and

---

[2]We note that "allegations are not proof." *In re Application of the County Treasurer & ex officio County Collector of Kane County*, 2018 IL App (2d) 170418, ¶ 35.

necessary." 750 ILCS 5/508(c)(3) (West 2016). Instead of ruling according to its findings of the reasonableness of Botti's billings, then notifying the ARDC of Botti's potential conflict of interest and allowing the possible disciplinary process to proceed, the trial court presided over its own mini-ARDC hearing that lacked due process and reversed the burden of proof. The trial court used its conclusion that a conflict existed to deny Botti fees for even reasonable and necessary services provided pursuant to the representation contract at reasonable and customary rates.

¶ 30    While the trial court referenced the Act and the Rules, its decision subverted both section 508 of the Act and the spirit and intent of the Rules. It is a decision that no reasonable person can agree with. Such an arbitrary decision is clearly an abuse of discretion that requires the reversal of the trial court's order of January 10, 2020, regarding the petitions for the setting of final fees and costs.

¶ 31    While the trial court's oral ruling specifically mentioned the appropriateness of Botti's billings as to the period ending June 12, 2016, the court also specifically addressed certain motions filed after that date, finding them to be " 'excessive and unreasonable.' " See *supra* ¶ 23 n.1. By implication, then, the court did review Botti's billings after June 12 and did not find anything else to be excessive or unreasonable; those post-June 12 billings were improperly denied strictly because they arose after the supposed conflict of interest. Thus, the cause must be remanded for entry of judgment in favor of Botti on all of its claimed fees, including those that should have been allowed but were denied due to the alleged conflict of interest. However, since neither party appealed the trial court's judgment regarding the unreasonableness and lack of necessity regarding the three motions, that portion of the judgment is affirmed.

¶ 32                                III. CONCLUSION

¶ 33    For these reasons, the judgment of the circuit court of Du Page County is affirmed in part and reversed in part, and the cause is remanded for the entry of judgment consistent with this opinion.

¶ 34    Affirmed in part and reversed in part.

¶ 35    Cause remanded.