2023 IL App (2d) 220248-U
No. 2-22-0248
Order filed March 8, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF PHYLLIS L. ANGSTEN, Deceased | ) ) ) ) ) ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | No. 15-PR-152 |
| (Nancy K. Angsten, Petitioner and Counter respondent-Appellee, v. Richard J. Angsten, Respondent and Counterpetitioner-Appellant). | ) ) ) ) | Honorable Michael J. Chmiel, Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court correctly ruled that the land trust was held in tenancy in common rather than joint tenancy. The executor did not make judicial admissions that required a contrary determination. The trial court did not err in not finding that Richard was the equitable owner of the residence. The trial court awarded Richard equitable contribution of decedent's half of the land trust, but that did not create a lien on the estate that was outside of probate. The trial court did not abuse its discretion in ordering that the executor's attorney fees be paid from the estate, rather than personally by the executor. Therefore, we affirm.

¶ 2    This is a probate case for the estate of decedent, Phyllis L. Angsten, who passed on April 29, 2014. The executor of the estate, decedent's daughter Nancy K. Angsten, and decedent's son, Richard J. Angsten, engaged in extensive litigation over the house where decedent resided. The

trial court ruled that decedent and Richard had a tenancy in common interest in the land trust, which held title to the residence. The trial court further awarded Richard decedent's 50% interest in the house due to his equitable contributions to the same, after a $40,000 award for the executor's attorney fees were paid from the estate.

¶ 3    On appeal, Richard argues that (1) the trial court did not rule on the question of whether the land trust was held in joint tenancy or tenancy in common; (2) the land trust was held by him in joint tenancy as a matter of law; (3) Nancy's judicial admissions required a finding of joint tenancy for the land trust; (4) he was the equitable owner of the residence, regardless of legal title; (5) he was entitled to contribution as a tenant in common, (6) his contribution created an equitable lien on the property that was outside of probate, and (7) the trial court erred in not requiring Nancy to pay her attorney fees, because she prosecuted this case in bad faith to pressure him into paying her to cease the litigation. We affirm.

¶ 4                                I.  BACKGROUND

¶ 5    Decedent and her husband, Philip[1] J. Angsten, had four children: Gregory S. Angsten, Daniel J. Angsten, Richard, and Nancy. In 1983, decedent, Philip, and Gregory moved into a home on 6206 Blue Court in Crystal Lake, Illinois (Blue Court Residence). Title to the Blue Court Residence was held in a land trust at Home State Bank of Crystal Lake. The land trust originally named decedent, Philip, and Gregory as joint tenants. The land trust agreement gave Gregory the sole power of direction. Gregory died in 1996 at the age of 47. Philip lived in the Blue Court Residence until his death in 1998. On March 12, 1998, the land trust was amended. The beneficial interest was changed to "Phyllis A. Angsten, Richard J. Angsten." Richard was given the sole power of direction.

_____

[1]In parts of the record, "Philip" is spelled "Phillip."

¶ 6    Decedent lived in the Blue Court residence until her death on April 29, 2014. About one year later, on May 15, 2015, Nancy filed a petition for letters of administration. She alleged that the approximate value of the estate was $10,000, and she did not list any real property. On May 20, 2015, Nancy was appointed independent administrator of the estate. On June 15, 2015, a will was filed. On September 1, 2015, Nancy filed a supplemental petition for probate of the will and for letters testamentary. The petition referenced a will dated February 8, 1996, personal property of about $80,000, and no real property.

¶ 7    In three status reports from 2016 and 2017, of which Richard allegedly had no notice, Nancy's attorney stated the that Blue Court Residence had not been sold. Nancy's attorney passed away in 2018.

¶ 8    On July 1, 2019, Nancy filed a petition to discover assets through a new attorney. She alleged that decedent had personal assets valued at $80,000 and an interest in the Blue Court Residence. She alleged that Richard continued to reside at the house without any accounting or payment to the estate and had not turned over all of decedent's property.

¶ 9    On July 22, 2019, Richard requested that Nancy sign an assignment of the estate's interest in the land trust to him.

¶ 10    On July 23, 2019, Richard filed a petition to admit a will dated February 8, 1996, into probate. On September 5, 2019, Richard filed a motion to order distribution of the estate. Nancy's attorney was granted leave to withdraw on September 23, 2019.

¶ 11    On October 21, 2019, the trial court granted the motion for the will to be admitted to probate as originally typed and signed by the decedent, without hand-marked interlineations and deletions. In its original form, decedent's will gave all of her personal property to Philip, if he survived decedent, and otherwise to Nancy. It gave the residue of her estate, excluding any

property over which she had power of appointment, to Richard in the amount of $100,000, with the balance divided equally among Richard, Daniel, and Nancy. The will designated Nancy as decedent's executor.

¶ 12 A new attorney entered an appearance for Nancy on November 15, 2019. Nancy was again appointed independent executor on December 18, 2019.

¶ 13 On February 18, 2020, Nancy filed a petition to determine title to the Blue Court Residence. Richard filed a response to the petition on March 11, 2020, that also included affirmative defenses and a counterpetition. Count I of the counterpetition was for a declaratory judgment and equitable reformation, and alleged the following. In approximately 1985, Richard started supporting his aged parents and Gregory, who suffered from a fatal disease and could no longer work or support himself. Thereafter, the four of them lived together at the Blue Court Residence. Richard was paying the home mortgage, real estate taxes, insurance, and other expenses. After Gregory's and Philip's deaths, Richard continued living with decedent, supporting her and paying all house-related expenses. In 1998, decedent hand-penned a land trust amendment form to designate Richard as an owner of the land trust, and the holder of the sole power of direction. Both she and Richard intended and believed that Richard was a joint tenant; the joint tenant designation typed in the original land trust was not changed. Nancy also believed that decedent and Richard were joint tenants, as shown by her first probate petition, in which she swore that decedent owned no real estate. Decedent further left a letter to her children confirming that Richard had supported her and Philip and paid for all housing expenses, and expressing her intent that Richard should have the house upon her death. He continued to live in the Blue Court Residence after decedent passed in 2014 and continued to pay all housing expenses. Richard requested that the trial court invoke an equitable remedy to recognize the substantial equity Richard had in the Blue Court Residence,

and (1) declare him to be a joint tenant; and/or (2) reform the land trust amendment to designate him as a joint tenant with his mother.

¶ 14    Count II of Richard's counterpetition was a claim for set-off in probate. He alleged the following. His share of the estate under decedent's will, before set-off, was $100,000 off the top of the estate and one-third of the residue. Nancy waited until six years after decedent's death to claim that the estate owned one-half of the Blue Court Residence, which was contrary to Nancy's original sworn statement. In her will, decedent had hand-penned a $300,000 distribution to Richard before any distribution to her other two living children, which was evidence of a recognition of a large debt to Richard for his support of the family. It was also consistent with her intention that Richard was a joint tenant of the land trust. Richard had spent $269,802 for expenses of the Blue Court Residence, including mortgage payments, home improvements, insurance and land trust fees, real estate taxes, and construction costs.

¶ 15    Richard additionally alleged that from time to time, Nancy had needed financial assistance. Richard therefore bought a condominium in Fitchburg, Wisconsin, for $135,000 where Nancy lived rent-free for about 17 years. During that period, Richard also paid all of the real estate taxes, condo dues, and expenses, totaling approximately $202,942. Nancy had never reimbursed Richard for any of those expenses. Further, Nancy's filings were in bad faith as shown by her waiting almost six years after decedent's death to seek to recover one-half of the value of the Blue Court Residence, which also contradicted Nancy's initial sworn statement. Nancy knew that her parents had no retirement income except Social Security, so her present claims of estate assets were calculated to harass Richard into paying her. Richard requested that the trial court provide him with set-offs against the estate and against Nancy personally; order Nancy to pay her own attorney

fees; order that Richard recover his attorney fees from Nancy or the estate; and order Nancy to sign a direction to the land trustee to vest 100% of the beneficial interest in Richard.

¶ 16     Nancy filed an executor's report of claims on November 30, 2020. The report stated that the estate's only significant asset was a 50% interest in the Blue Court Residence. Richard had resided there since decedent's death, so the estate could make a claim against him for imputed rent, but such a claim was not worth pursuing because Richard would have an offsetting claim for property taxes, insurance premiums, and maintenance expenses. The report further stated that decedent's funeral expenses could constitute a first-class claim, but the expenses were paid with gold coins belonging to decedent. Nancy also filed an inventory on November 30, 2020, that valued the 50% interest in the land trust at $213,000.

¶ 17     Richard filed an amended counterpetition on December 15, 2020, and a second amended counterpetition on March 29, 2021. Count I again was for a declaratory judgment and equitable reformation and requested that the trial court: (1) issue a declaratory judgment that the words "joint tenants" had never been deleted from the land trust; (2) if there was ambiguity on the joint tenant issue, declare that decedent's intent was that Richard be a joint tenant; (3) equitably reform the land trust amendment to provide that Richard was the sole owner; (4) direct Nancy to sign a direction to the land trustee to vest 100% of the beneficial interest in Richard; and (5) require Nancy to pay Richard's attorney fees and the executor's attorney fees due to Nancy's bad faith denials of Richard's equities in the home.

¶ 18     Count II alleged unjust enrichment, with allegations similar to those of the prior set-off claim.

¶ 19     Count III alleged contribution by a tenant in common. Richard sought a contribution from the estate of $229,713.09 and that Nancy pay her and Richard's attorney fees.

¶ 20 A trial took place on March 18, 2022, and April 11, 2022. Nancy did not attend and declined to participate by phone or Zoom, but her attorney was present. The parties stipulated to the land trust agreement and amendment being admitted into evidence. After discussion, the trial court stated, "I'm finding that the estate has a half interest in the house. That remains as the only asset of the estate based upon the amendment creating a tenants in common interest for the estate and the real estate in question." The trial court stated that it made its finding based on clear and convincing evidence, as the applicable statute required specificity for a joint tenancy interest.

¶ 21 Richard's attorney argued that Richard and decedent had intended for the house to be held in joint tenancy, as demonstrated by a letter that decedent wrote, and that the court could reform the trust to reflect the parties' actual intent. The trial court sated that the Deadman's Act precluded introduction of the letter "and or hearsay." Richard's attorney cited two cases in support of her argument that the Deadman's Act did not apply to citation proceedings. The trial court stated:

> "And my ruling, based upon what you all have presented, is going to be that the Deadman's Act applies. I stand to be corrected, but I believe it should apply; and I'm finding it does apply, notwithstanding the citation to a 1959 and a 1978 case ***."

The trial court stated that the cases were from the "last century, the last millennium," and from other appellate districts.

¶ 22 Daniel then testified as follows. Philip was born in 1909, was 70 years old when he retired around 1979, and died in 1998. Decedent was born in 1923 and was 91 years old when she died in 2014. Philip and decedent had lost their prior home and all of its equity due to defaulting on the mortgage, at a time when Philip was already retired. Therefore, the three sons built the Blue Court Residence with their own labor and funds. Their parents lived in the home until their respective deaths. All of the children other than Nancy initially lived with Philip and decedent in the Blue

Court Residence in 1983. Daniel was there for a brief period of time, until he got married. Gregory obtained a mortgage on the house, but within one year, he told Richard to make the payments because he no longer could. Richard made the mortgage payments from that time on.

¶ 23    When decedent passed, the house was under repair. The kitchen was being replaced, and two decks on the back of the house "were beyond salvage" and needed to be repaired or replaced. At the time of trial, the house was in the same condition "plus seven or eight years." Daniel worked at a lumber company and knew that lumber costs had nearly quadrupled. A deck builder had provided an estimate of $84,620 to replace the decks, inclusive of labor costs.

¶ 24    Richard testified as follows. Both he and Gregory provided the money to build the Blue Court Residence, and it did not have an initial mortgage. In 1986, Gregory needed cash to sustain himself because he was not working, and he took out a $100,000 mortgage on the home. Gregory paid the mortgage for less than a year, and Richard gave him some money during that time to help with the payments. In the beginning of 1987, Gregory told Richard that he could not make the mortgage payments and asked Richard to do so. Richard made the monthly mortgage payments and also paid the property taxes, home insurance expenses, and $71,147 for work on the home. After Gregory and Philip died, Richard continued to live in the Blue Court Residence and still lived there at the time of trial.

¶ 25    In 2000, decedent asked Richard if he could find Nancy a home so that she could move out of her apartment; Nancy was having trouble with some of her neighbors. Richard bought a townhouse and paid the property taxes and condo dues. The settlement statement showed that Nancy paid $1000 for earnest money and he paid $182,000. Nancy lived there until 2016, and she never paid Richard rent. He was requesting $180,000 in contribution or set-off if the trial court found that he was a tenant in common of the Blue Court Residence.

¶ 26 An appraiser had valued the Blue Court Residence at $288,000, with the limiting condition that there were unfinished portions of the house. A 2020 property tax bill valued the property at $306,770.

¶ 27 On April 8, 2022, Nancy's attorney filed a petition seeking $45,282.25 in attorney fees and expenses.

¶ 28 The trial court issued a written order on June 14, 2022, which we summarize. After the trial, it had provided findings from the bench and directed the parties' attorneys to prepare a proposed order for consideration by the court, but they were unable to agree to an order. The trial court therefore wrote its own order. It received evidence in the form of testimony and exhibits. It found the evidence reliable except for certain self-serving testimony of Richard. Generally, Richard had been a benefactor of his family, including decedent and Nancy. Litigation had protracted the case, as the interplay between law and equity had "challenged the parties, and perhaps at times, their counsel." The court continued:

"When the Court factors into the equation of who should take what from the estate of this case, the Court finds Richard should be able to take that to which he is legally entitled—half of the net value of the real estate of the deceased, along with the remainder of the value of the real estate to which the estate is entitled. While Richard's purported proofs belie some of his claims, the Court finds the possible value which may exist is usurped through his contributions to preserve and protect the same.

Richard's entitlement, however, is subject to Nancy's administrative expenses— claims—which had to be undertaken. These claims are found to involve the fees and expenses incurred through her attorney, Jack Richtman, and his law firms. After carefully reviewing the long and at times unending litigation in this case, the Court finds each side

should bear some responsibility. As such, the Court finds Attorney Richtman and his firms should be reimbursed and otherwise paid up to $40,000.00 for the legal work in this case through the entry of this Decision and Order, with this amount being actually, necessarily, and reasonably incurred."

The trial court awarded Richtman $40,000 in attorney fees and awarded Richard "the value in this estate which remains after said administrative claim is satisfied."

¶ 29    Richard timely appealed.

¶ 30                                    II. ANALYSIS

¶ 31                        A. Joint Tenancy or Tenancy in Common

¶ 32                        1. Whether Trial Court Ruled on the Issue

¶ 33    We first address Richard's argument that the trial court failed to rule whether the land trust was in joint tenancy or tenancy in common, but rather "left it murky *** to force the parties to a 30-day close-out of the estate." Richard argues that to hide its lack of ruling on the issue and its violation of Richard's rights, the trial court further impounded the parties' memoranda of law that they had prepared in advance of the citation proceeding.

¶ 34    We disagree that the trial court did not rule on this issue. The trial court's ruling stated that it found that "Richard should be able to take that to which he is legally entitled—half of the net value of the real estate of the deceased, along with the remainder of the value of the real estate to which the estate is entitled." The trial court's finding that Richard was legally entitled to "half of the net value of the real estate" was an implicit statement that the trial court found that the land trust was held in tenancy in common.

¶ 35    Further, "orders of the circuit court must be interpreted from the entire context in which they were entered, with reference to other parts of the record including the pleadings, motions, and

issues before the court and the arguments of counsel. *In re Jennice L.*, 2021 IL App (1st) 200407, ¶ 18; see also *In re Marriage of Heasley*, 2014 IL App (2d) 130937, ¶ 28 (an ambiguous order should be interpreted within the context of the record at the time the order was entered, considering the pleadings, motions and issues before the court, report of proceedings, and counsels' arguments).

¶ 36    Here, before the testimony began, the trial court explicitly stated, "I'm finding that the estate has a half interest in the house. That remains as the only asset of the estate based upon the amendment *creating a tenants in common interest for the estate* and the real estate in question." (Emphasis added.) During Richard's closing arguments on the second day of trial, the trial court stated, "I thought I resolved the issue clearly that we are dealing with a tenants in common situation and not joint tenancy," to which Richard's attorney replied, "You did." Accordingly, Richard's current assertion that the trial court did not rule on the issue is meritless. Further, although it is not clear why the parties' memoranda of law were impounded, we note that the report of proceedings, the vast majority of the common law record, and the trial court's order were not impounded, so there is no indication that the trial court was trying to hide its decisions in this case.

¶ 37                                    2. Construing the Land Trust

¶ 38    We now turn to Richard's argument that the trial court erred in ruling that the land trust was held in tenancy in common rather than in joint tenancy. Richard notes that the 1983 land trust agreement declared joint tenants, and that the 1998 bank form amendment did not declare either joint tenants or tenants in common. Richard contends that the law requires that the trust and its amendment be read together as one document and result in a conclusion of joint tenancy.

¶ 39    Richard recognizes that section 2 of the Joint Tenancy Act (765 ILCS 1005/2 (West 1998)) provides:

"Except as to executors and trustees, and *except also where by will or other instrument in writing expressing an intention to create a joint tenancy in personal property with the right of survivorship*, the right or incident of survivorship as between joint tenants or owners of personal property is hereby abolished, and all such joint tenancies or ownerships shall, to all intents and purposes, *be deemed tenancies in common*." (Emphases added.)

Richard argues that the land trust agreement together with the amendment meet the requirements of section 2, as the land trust agreement expressly declares joint tenancy. Richards maintains that the amendment form asked who the "current beneficiaries" were, and that decedent did not copy the words "joint tenants" presumably because it was not a "current beneficiary." Richard points out that there was no box to check on the amendment form to elect joint tenancy or tenancy in common. Richard argues that it is clear that decedent thought that she had put her affairs in order on the heels of her husband's death.

¶ 40    Richard further argues that to the extent that there is an ambiguity, the document should be interpreted in favor of him, the grantee. See *In re Estate of Aryeh*, 2021 IL App (1st) 192418, ¶ 35. Richard adds that where there is ambiguity, extrinsic evidence is admissible to ascertain the grantor's and grantee's intent. See *Hoch v. Boehme*, 2013 IL App (2d) 120664, ¶ 42. Relatedly, Richard argues that Black's Law Dictionary defines "deemed," a word used in section 2, as a disputable presumption, such that a presumption of tenancy in common could be overcome. He also asserts that failure to allocate a percentage of ownership indicates joint tenancy, citing *In re Estate of Goldstein*, 293 Ill. App. 3d 700, 707 (1997).

¶ 41    Nancy argues that under section 2, unless the instrument expressly states that it is in joint tenancy, the tenancy is deemed to be a tenancy in common. Nancy argues that because the trust

amendment creating Richard's interest in the Blue Court Residence did not state that there was a joint tenancy, Richard held a tenancy in common with decedent. Nancy argues that decedent did not include express language of survivorship, so her interest could not pass to Richard upon her death, but rather passed to her estate. Nancy argues that this is further evidenced by Richard's attempt to have Nancy execute an assignment of the estate's interest in the land trust to him.

¶ 42    We construe the language of a trust according to the same rules of construction that we use for interpreting wills and other contracts. *Corcoran v. Rotheimer*, 2022 IL App (1st) 201374, ¶ 25. Our primary goal is to ascertain and give effect to the settlor's intent, so long as that intent does not conflict with the law or state public policy. *Id.* We determine the settlor's intent by examining the trust's language, given its plain and ordinary meaning. *Id.* "[W]here two or more instruments create, define, or relate to a trust, they should be construed together to effectuate the intent of the settlor." *Corcoran*, 2022 IL App (1st) 201374, ¶ 25; see also *Lambos v. Lambos*, 9 Ill. App. 3d 530, 534 (1972) (entire land trust documents must be considered to ascertain the parties' intent). We determine the intent as expressed by the instrument's language as opposed to the intent presumed to have been in the testator's mind. *Spencer v. Di Cola*, 2014 IL App (1st) 121585, ¶ 21. Extrinsic evidence may be admitted to determine intent only if the document is ambiguous. *Altenheim German Home v. Bank of America, N.A.*, 376 Ill. App. 3d 26, 32 (2007). Language will be considered ambiguous if it is reasonably susceptible to multiple interpretations. *Id.* ¶ 22. "The construction of a trust presents an issue of law that we review *de novo*." *Chicago Trust Co. v. Brierton*, 2022 IL App (1st) 210741, ¶ 17.

¶ 43    In a conventional trust, a trustee holds legal title to the property and the beneficiary holds equitable title to the property. *Corcoran*, 2022 IL App (1st) 201374, ¶ 29. However, in Illinois, a land trust trustee holds both legal and equitable title to the property. *Id.* That is, the owner of the

real estate conveys the real property into a trust, becomes the trust beneficiary, and owns just a beneficial interest in the trust *res*. The land trustee holds legal title to the real estate, such that the owner's interest in the real estate is equitably converted from a real property interest to a personal property interest. *Id.* The beneficiary therefore cannot transfer legal title to the property, but can convey their beneficial interest in the trust, which is personal property, through an assignment. *Id.* ¶¶ 30-31. In general, land trust agreements can be freely amended. *Dorman v. Central National Bank in Chicago*, 97 Ill. App. 3d 429, 432 (1981).

¶ 44    Here, the original land trust beneficiary designation states: "Gregory S. Angsten and Phillip [*sic*] J. Angsten and Phyllis L. Angsten, as joint tenants." The amendment to the trust agreement states in handwriting, after the printed words "Current Beneficiary": "Gregory S. Angsten, Philip J. Angsten and Phyllis L. Angsten." After the printed words "Current Power of Direction" is handwritten "Gregory S. Angsten." The document continues with the printed words:

> "The said undersigned, currently holding the entire beneficial interest in said above mentioned trust, hereby desires to change the Beneficial Interest and/or the Power of Direction.
>
> Now therefore, the undersigned does herewith change:
>
> The Beneficial Interest to read as follows:"

After the last phrase the handwritten names "Phyllis L. Angsten, Richard J. Angsten" appear. The amendment also changes the power of direction to "Richard J. Angsten."

¶ 45    Looking at the document as a whole, consisting of both the original land trust and amendment, we agree with the trial court that, as amended, the land trust was unambiguously held in tenancy in common rather than in joint tenancy. Under section 2, joint ownership of personal property is considered to be tenancies in common except where there is an "instrument in writing

expressing an intention to create a joint tenancy in personal property with the right of survivorship." 765 ILCS 1005/2 (West 1998). In the original land trust, there was such an expression, in that the words "as joint tenants" was included after the names. However, the amendment to the land trust did not include such language after "Phyllis L. Angsten, Richard J. Angsten," contrary to the statutory requirements to create a joint tenancy. See also *O'Vadka v. Rend Lake Bank*, 203 Ill. App. 3d 1007, 1014 (1990) ("Title to personal property may be held in joint tenancy with right of survivorship where the appropriate language is employed at the creation of the tenancy."). To construe the amendment to include the joint tenancy language would be reading into it terms it does not contain, contrary to its express language and the rules applicable to the construction of trusts. Accordingly, we conclude that the land trust was held in tenancy in common.

¶ 46    Richard's argument about the meaning of the word "deemed" in section 2 does not change this result. He purports to cite Black's Law Dictionary as authority for "deemed" meaning a disputable presumption, but he does not cite to a particular edition of Black's Law Dictionary, as would be necessary to check his citation. As relevant to this case, the 2019 edition of Black's Law Dictionary defines "deem" as "[t]o consider, think, or judge." Black's Law Dictionary (11th ed. 2019). We further find no support in *In re Estate of Goldstein*, 293 Ill. App. 3d at 707, for Richard's assertion that the lack of a percentage allocation indicates joint tenancy. Regardless, section 2 requires an instrument in writing that expresses an intention to create a joint tenancy, which did not occur here.

¶ 47                                  3. Judicial Admissions

¶ 48    Richard further argues that Nancy made judicial admissions that require a finding of joint tenancy for the land trust. He asserts that her first verified probate petition indirectly admits that

the land trust is in joint tenancy, as she swore that decedent's property consisted of $10,000 of personal property and no real estate. Richard argues that he and Daniel confirmed that decedent had no assets at death, and that this was known by Nancy.

¶ 49    Richard argues that Nancy made a second sworn judicial admission in response to count III of his amended counterpetition, which alleged in the alternative that he was a tenant in common with decedent. Nancy's answer stated, "The Executor denies this allegation." Richard cites *Avila v. Chicago Transit Authority*, 2021 IL App (1st) 190636, ¶ 42, which states that an admission in a verified answer is a binding judicial admission. Richard argues that the judicial admissions bar Nancy's claim of tenancy in common and also demonstrate Nancy's bad faith, as she objected to everything in order to harass Richard enough that "he would pay her to get out of the case."

¶ 50    Nancy responds that her original petition was correct that decedent owned no real property because the home was held in a land trust, so it was decedent's personal property. She argues that the value of the estate set forth in the original petition was no more than an estimate and had no probative effect on whether the property was held in joint tenancy. Nancy contends that the denial of Richard's allegation that he was a tenant in common with his mother was also correct, as the decedent died on April 29, 2014, and the allegation was made on March 29, 2021, at a time that Richard was a co-tenant with the estate, as opposed to his mother.

¶ 51    We agree with Nancy that decedent technically did not own any real estate because the Blue Court Residence was held in a land trust, and was therefore personal property. See *Corcoran*, 2022 IL App (1st) 201374, ¶ 29. We further note that Nancy's September 1, 2015, supplemental petition estimated decedent's personal property to be worth about $80,000. We also agree with Nancy that her denial of Richard's alternative allegation that he was a tenant in common with

decedent was not a judicial admission of joint tenancy, as Richard was a tenant in common with decedent's estate rather than decedent at the time of his pleading.

¶ 52                         B. "Ownership" of Land Trust

¶ 53   Richard additionally argues that the trial court confused record title with "ownership" equity as required by the citation statute, as ownership equities are not dependent on record title. According to Richard, the trial court correctly determined that he had all of the equity in both halves of the home but erred in declaring that the record title in the estate caused 50% of the ownership to be in the estate.

¶ 54   Richard cites *In re Hill's Estate*, 42 Ill. App. 2d 396 (1963), for the proposition that to determine ownership in a citation proceeding, the court is to ascertain the decedent's intent regarding ownership of the property after the decedent's death. In that case, stock certificates in the late husband's name were in the wife's possession at the time of the husband's death but were unendorsed. *Id.* at 398-99. The executor argued that the estate owned the stocks, as they were in the husband's name. *Id.* at 397. The appellate court held that the testimony of the wife and a disinterested witness showed by clear and convincing evidence that the husband's transfer of the possession of the stock to the wife before his death, with expressions that he intended that she own the stock, constituted an *inter vivos* gift to the wife of the stock. *Id.* at 403-08.

¶ 55   Richard maintains that he provided substantial evidence that he paid for and owned all of the equity in the Blue Court Residence, such that decedent was not the equitable owner. He argues that decedent's intent is shown by a hand-penned letter from decedent to her children confirming that Richard paid for the house and that her intention was for him to have it upon her death. Richard asserts that the trial court erred in ruling that the letter was inadmissible under the Dead Man's Act, as the statute bars only testimony as to conversations. Defendant cites *Muka v. Estate of Muka*,

164 Ill. App. 3d 223, 231 (1987), where the court held that a tape recording left by the decedent was not barred by the Dead Man's Act. Richard argues that the Dead Man's Act does not apply to citation proceedings, as *Hill* allowed evidence under an exception of the Dead Man's Act. *In re Hill's Estate*, 42 Ill. App. 2d at 404.

¶ 56    Richard further argues that he alleged as an affirmative defense that the letter confirmed his support of his parents by paying all of the mortgage and real estate taxes, and decedent's intention that he have the house, and that Nancy's answer simply stated that the letter spoke for itself. Richard maintains that Nancy failed to deny that decedent wrote the letter, that he paid for "all" of the house, and that decedent's intent was for Richard to have the house. Richard asserts that the failure to deny these points is an admission.

¶ 57    Citing *Glos v. Huey*, 181 Ill. 149 (1899), Richard argues that his possession of the Blue Court Residence for 39 years, along with a claim of ownership, are *prima facie* evidence of ownership. Richard cites *In re Estate of Baumgarth*, 23 Ill. App. 2d 319, 326-28 (1959), for the proposition that the burden is on the executor in a citation proceeding to provide clear and convincing evidence to recover an asset from a respondent in possession. Richard argues that Nancy did not rebut his evidence of ownership in the hearing on his counterpetition. Richard contends that the trial court should have granted his counterpetition for 100% of the ownership regardless of title, because equity overcame the title.

¶ 58    Nancy responds that *In re Estate of Hill* is distinguishable because it involved principles of ownership in stock certificates where delivery of the instruments shows the intent of transfer, whereas a beneficial interest in a land trust cannot pass by manual delivery. Nancy maintains that *In re Estate of Hill* also involved a disinterested third-party witness, but there was no such witness here. Nancy argues that *In re Estate of Baumgarth*, 23 Ill. App. 2d 319, does not stand for the

principle that the executor has the burden of proof by clear and convincing evidence, but rather that fraud must be proven by clear and convincing evidence.

¶ 59    Nancy asserts that there is no dispute that Richard contributed substantial sums for the upkeep of the property, but there is no legal support for the idea that he was the equitable owner of all of the property. Nancy argues that decedent never had to pay for her equity because she had an interest in the property before it was built and before Richard began making any payments.

¶ 60    Nancy additionally argues that the trial court's refusal to admit the undated letter purported to have been written by decedent was proper, as decedent already has a will and a land trust and there is no indication whether the letter was written before or after those instruments were created, or under what circumstances it was written. Nancy maintains that, at best, it was an indication of her wishes on some unknown date and time. Nancy also argues that Richard failed to preserve his argument because he did not provide an offer of proof regarding the admission of the letter.

¶ 61    Section 16-1 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/16-1 (West 2020)) allows for petitions or citations to be brought on behalf of the estate where there is an issue regarding property which belongs to the decedent, his estate, or his representative. The representative must establish a *prima facie* case that the property belongs to the decedent's estate, at which point the burden shifts to the respondent to prove his or her right to possession by clear and convincing evidence. *In re Estate of Mathers*, 2022 IL App (3d) 210410, ¶ 14. Section 16-2 allows a third party to file a petition making a claim to property that is in the possession or control of the estate's representative. 755 ILCS 5/16-2 (West 2020).

¶ 62    "The court may hear the evidence offered by any party, may determine all questions of title, claims of adverse title and the right of property and may enter such orders and judgment as the case requires." *Id.* We will not disturb a trial court's finding of whether certain property belongs

to the estate unless it is against the manifest weight of the evidence. *In re Estate of Elias*, 408 Ill. App. 3d 301, 315 (2011).

¶ 63     We briefly address Richard's argument that Nancy should be deemed to have judicially admitted that Richard paid various amounts for the Blue Court Residence's mortgage, taxes, and upkeep. We determine that such an analysis is not necessary because Nancy largely concedes this issue on appeal, and the trial court itself made findings about Richard's financial "contributions to preserve and protect" the residence.

¶ 64     We now turn to the trial court's ruling denying the admission of the letter under the Dead Man's Act. Contrary to Nancy's argument, Richard did not forfeit this issue by failing to provide an offer of proof, as an offer of proof is unnecessary if it is clear that the trial court understood the evidence's nature and character. *In re Estate of McDonald*, 2022 IL 126956, ¶ 86. Here, Richard's attorney described the letter, and a copy of the letter is contained in the record, so Richard did not need to make an offer of proof.

¶ 65     The Dead-Man's Act provides, in relevant part:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to *testify on his or her own behalf to any conversation with the deceased  *** or to any event which took place in the presence of the deceased ***.*" (Emphases added.) 735 ILCS 5/8-201 (West 2020).

¶ 66     The purpose of the Dead-Man's Act is to protect decedents' estates from fraudulent claims and equalize the parties' positions in regard to giving testimony. *In re Estate of Weber*, 2021 IL App (2d) 200354, ¶ 26. It is not intended to disadvantage the living, and it bars only evidence that the decedent could have refuted. *Id.* A trial court's construction and interpretation of the Dead-

Man's Act presents a question of law that we review *de novo*. *In re Estate of McDonald*, 2022 IL 126956, ¶ 56. Its application of the Dead-Man's Act is an evidentiary matter that will be reviewed for an abuse of discretion. *Morrow v. Pappas*, 2017 IL App (3d) 160393, ¶ 39.

¶ 67    The primary rule in statutory interpretation is to ascertain and give effect to the legislature's intent, which is best indicated by the statute's language, when given its plain and ordinary meaning. *International Ass'n of Firefighters, Local 150 v. City of Peoria*, 2022 IL 127040, ¶ 12. Here, we agree with Richard that the Dead-Man's Act does not apply to the letter itself, as the letter was neither a conversation nor an event. See *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 89 (under the Dead-Man's Act, " '[o]nly unwitnessed conversations with the decedent are off limits.' "); *cf. Muka*, 164 Ill. App. 3d at 231 (Dead-Man's Act did not bar admission of a tape recording made by the decedent).

¶ 68    We further agree with Richard that the Dead-Man's Act itself does not apply with the same force in citation proceedings. "All witnesses in a citation proceeding are witnesses for the court and the rules of evidence in such proceedings are to be liberally construed, particularly those rules under the Dead Man's Act." *In re Estate of Kaminski*, 200 Ill. App. 3d 309, 315 (1990); see also *In re Estate of Maslowski*, 204 Ill. App. 3d 379, 386 (1990) (in a citation proceeding, many rules of evidence are to be liberally applied, and the trial court did not abuse its discretion in allowing the respondent to testify to conversations she had with the decedent); *Shanahan v. Bowen*, 59 Ill. App. 3d 269, 273 (1978) (same).

¶ 69    In a citation proceeding, the admission of evidence is within the trial court's discretion. *Bjork v. O'Meara*, 2013 IL 114044, ¶ 30. "Error is committed when a trial court refuses to exercise its discretion in the erroneous belief that it has no discretion as to the question presented." *Id.* ¶ 31.

As the trial court incorrectly believed that it did not have the discretion to allow the letter into evidence due to the Dead Man's Act, it abused its discretion.

¶ 70     That being said, we also conclude that the trial court's error is not reversible error. As Nancy points out, there are issues with the letter, as it is not dated and the circumstances surrounding its writing are unknown. More importantly, even if the trial court had admitted the letter, it would not support Richard's claim of ownership. Richard relies primarily on *In re Hill's Estate*, but that case involved a husband's transfer of the possession of stock to his wife before his death, and evidence that he intended that she own the stock, which the appellate court concluded was an *inter vivos* gift to the wife. "*Inter vivos*" means "[o]f, relating to, or involving property conveyed not by will or in contemplation of an imminent death, but during the conveyor's lifetime." Black's Law Dictionary (11th ed. 2019). That is, the court determined that the stock did not belong to the estate because the husband had already gifted it to his wife during his lifetime, not because he intended for her to have it after his death. The letter at issue here presents the latter situation, as it is explicitly entitled "My Wishes for my family when I die." That decedent allegedly wished for Richard to have the house after her death would not prevent decedent's share of the house from first passing through her estate and being subject to the executor's attorney fees.

¶ 71     Richard's citations to cases concerning legal title versus ownership considerations are not persuasive, as legal title to the Blue Court Residence was held by the bank, and both Richard and decedent lived in the property. Richard cites no case that convinces us that the trial court's determination, that the estate had a one-half interest in the house, was against the manifest weight of the evidence or otherwise erroneous.

¶ 72                    C. Contribution as Tenant in Common

¶ 73    Richard points out that in count III, he asked, as an alternative to joint tenancy, that the trial court order contribution from decedent's estate of $229,713.09 if it determined that they were tenants in common to the land trust. Richard cites *NAB Bank v. LaSalle Bank, N.A.*, 2013 IL App (1st) 121147, ¶ 22, where the court stated that each tenant in common is responsible for expenses like real estate taxes and insurance and has a right to financial contribution from the other.

¶ 74    Richard recognizes that the trial court declared that he owned all of the value of the home, subject only to probate fees. Nancy argues that the trial court therefore effectively awarded Richard contribution as a tenant in common. We agree.  The trial court stated that Richard was entitled to "half of the net value of the real estate of the deceased, along with the remainder of the value of the real estate to which the estate is entitled." It continued that "[w]hile Richard's purported proofs belie some of his claims, the Court finds the possible value which may exist is usurped through his *contributions* to preserve and protect the same." (Emphasis added.). The trial court awarded Richard "the value in this estate which remains after said administrative claim is satisfied." Accordingly, Richard's argument is without merit.

¶ 75                        D. Equitable Lien Outside of Probate

¶ 76    We next address Richard's argument that a tenant in common's right to receive contribution creates an equitable lien for security on the property outside of probate, and is not subject to subordination to the priority of estate expenses, such as the executor's attorney fees.

¶ 77    Richard cites *Carlisle v. Jaskiewicz*, 124 Ill. App. 3d 487 (1984), and *Sterling S&L Associates v. Schultz*, 71 Ill. App. 2d 94 (1966), for the proposition that a lien is created in favor of a tenant in common to the extent his contributions exceed his proportionate ownership. Richard argues that when there is a contribution lien on a land trust, the collateral does not become part of the assets of the decedent's estate until the lien is first discharged, citing *In re Estate of Yealick*,

69 Ill. App. 3d 353, 355 (1979). Richard argues that probate claims may be paid only from any equity remaining after the lien is paid. *Id.* Richard contends that this court has held that the allowance of attorney fees as an expense of the estate does not give the payment priority over a bank's security interest. *In re Estate of Denton*, 2012 IL App (2d) 110814, ¶¶ 59-64; see also *In re Estate of Philip*, 114 Ill. App. 3d 107, 111 (1983). Richard argues that in this case, no equity remained for probate after payment of his contribution lien, as 50% of his expenditures was $229,773 whereas the highest valuation for decedent's 50% of the land trust was $153,385 based on the township assessor's most recent valuation of the Blue Court Residence.

¶ 78    Nancy argues that *Schultz* did not say that an equitable lien would come ahead of a higher class claim in a probate proceeding. She maintains that the rest of the cases Richard cites are distinguishable because each involved a statutory lien that was granted or perfected prior to the probate proceeding, whereas here there was no secured collateral.

¶ 79    Regarding priority of payments in probate proceedings, section 18-13 of the Probate Act states:

> "Except as provided in Section 19-6 [involving a decedent's business], the representative of a decedent's estate shall pay from the estate all claims entitled to be paid therefrom, in the order of their classification, and when the estate is insufficient to pay the claims in any one class, the claims in that class shall be paid pro rata." 755 ILCS 5/18-13 (West 2020).

First class claims against a decedent's estate are funeral and burial expenses, "expenses of administration," statutory custodial claims, and final fees and costs relating to guardianship. 755 ILCS 5/18-10 (West 2020). Second class claims are the surviving spouse's or child's award; third class claims are debts due to the United States; fourth class claims are certain medical and

employee expenses; fifth class claims are money and property in trust by decedent that cannot be identified or traced; sixth class claims are debts due to the state and governing bodies within the state; and seventh class claims are "[a]ll other claims." Attorney fees are part of expenses of administration and are included in the first class claims against an estate. *In re Estate of Funk*, 221 Ill. 2d 30, 91 (2006).

¶ 80    Assuming, *arguendo*, that Richard had an equitable lien on decedent's portion of the land trust, the central issue is whether that lien would be outside of probate, as otherwise the attorney fees of the estate would have priority. In *In re Estate of Funk*, the United States government advanced an argument similar to that of Richard, citing "a number of Illinois cases [including *In re Estate of Philip* and *In re Estate of Yealick*] which have held that where property left by a decedent is subject to a lien, the property does not become an asset of the estate until the creditor's lien is discharged." *Id.* at 92. Our supreme court stated that none of the cases "directly addressed the situation presented by this case, namely, whether a creditor's security interest in property entitles it to jump ahead of claims for expenses of administration that would otherwise fall within a higher classification under the Probate Act. The distinction is critical." The court stated that although a valid security interest would give a creditor preference over an unsecured creditor in the same or lower classification under the Probate Act, "the fact that a claim is secured by a lien upon real or personal property gives the claimant no superior rights in the matter of classifying claims." *Id.* (citing 6 Ill. Jur., *Probate, Estates & Trusts* § 29:20 (2001)). *In re Estate of Denton*, 2012 IL App (2d) 110814, is distinguishable because it involved a guardianship estate, to which sections 18-10 and 18-13 are inapplicable. *Id.* ¶ 47. Therefore, Richard is incorrect in his assertion that an equitable lien would give his claim priority over the classification system in the Probate Act.

¶ 81                                     E. Attorney Fees

¶ 82    Last, Richard argues that based on his previous arguments, the estate has no assets to pay the $40,000 attorney fees. However, we have considered and rejected Richard's assertions that would lead to a determination that decedent did not own 50% of the land trust, or that it did not become part of her estate.

¶ 83    Richard further argues that his counterpetition asked that the attorney fees be charged to Nancy due to her bad faith as the executor. Richard maintains that the trial court *de facto* denied this relief by ordering that the fees be paid from the estate. Richard argues that Nancy should be responsible for the fees because she engaged in litigation only to benefit herself and not to benefit the estate. Richard argues that Nancy knew that decedent had no assets and had been supported by him for 30 years, as shown from her first petition where she declared that decedent had $10,000 of personal property and no real estate. Richard cites various cases for the proposition that executors are charged with their own attorney fees when pursuing litigation for their personal benefit rather than the estate's benefit. Richard references Nancy's years-long delays in pursuing the case, her demands that he produce decades of records of payment for the house, her alleged repeated failures to produce documents, and her refusal to participate in the hearing, among other things. Richard argues that Nancy engaged in calculated harassment to force him to settle by paying her to dismiss the litigation. Richard does not contest the amount of attorney fees awarded but rather argues that Nancy should be responsible for paying them.

¶ 84    Nancy argues that nothing in the record supports Richard's claim that she was attempting to harass him. She argues that she never filed suit against Richard, but rather merely sought to determine ownership of the real estate. Nancy claims that Richard knew from the beginning that he did not have full ownership of the land trust but still persisted in his claim of full ownership.

Nancy argues the numerous petitions and motions in the record show that it was Richard, and not she, who was the aggressor in this action.

¶ 85    A trial court has broad discretionary powers in awarding an executor's attorney fees, and it is not required to order them paid exclusively from the estate. *In re Estate of Elias*, 408 Ill. App. 3d at 323. Attorney fees should be rejected where the legal services are not in the estate's interest. *In re Lipchik's Estate*, 27 Ill. App. 3d 331, 336 (1975). "Attorney fees for an executor can be assessed against a party in a probate proceeding based either on equitable contribution, or as punitive damages where there was willful or outrageous conduct due to evil motive or a reckless indifference to the rights of others." *In re Estate of Elias*, 408 Ill. App. 3d at 326.

¶ 86    The trial court addressed the issue of the responsibility for attorney fees when it stated, as previously mentioned:

"Richard's entitlement, however, is subject to Nancy's administrative expenses—claims—which had to be undertaken. These claims are found to involve the fees and expenses incurred through her attorney, Jack Richtman, and his law firms. After carefully reviewing the long and at times unending litigation in this case, the Court finds each side should bear some responsibility. As such, the Court finds Attorney Richtman and his firms should be reimbursed and otherwise paid up to $40,000.00 for the legal work in this case through the entry of this Decision and Order, with this amount being actually, necessarily, and reasonably incurred."

Thus, the trial court found that the attorney fees were reasonably incurred in this action, and that both sides contributed to the "the long and at times unending litigation in this case."

¶ 87    Based on our review of the record, we cannot say that the trial court abused its discretion by ordering that the $40,000 in attorney fees for the executor be paid by the estate, as opposed to

ordering that Nancy be personally liable for them. We note that depending on her fee agreement, Nancy could be responsible for the portion of attorney fees that the trial court did not award.

¶ 88                                    III. CONCLUSION

¶ 89    For the reasons stated, we affirm the judgment of the McHenry County circuit court.

¶ 90    Affirmed.